# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 01-1899

_____

| | | |
|---|---|---|
| Donald Joe Hall, | * | |
| | * | |
| Petitioner/Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the Western |
| | * | District of Missouri. |
| Allen Luebbers, Superintendent of | * | |
| Potosi Correctional Center, | * | |
| | * | |
| Respondent/Appellee. | * | |

_____

Submitted: April 15, 2002

Filed: July 15, 2002

_____

Before WOLLMAN, LOKEN, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

Donald J. Hall was convicted in Missouri circuit court of first degree murder and sentenced to death. After the judgment and the denial of post conviction relief were affirmed, Hall filed this petition for writ of habeas corpus under 28 U.S.C. § 2254. The district court[1] denied the petition, but granted a certificate of appealability on sixteen claims. It later amended the certificate to permit Hall to appeal its orders

_____

[1]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

denying his requests for an evidentiary hearing, discovery, and leave to supplement the record.  We affirm.

## I.

On December 15, 1992, Bill White was shot at close range while working at his jewelry store in Springfield, Missouri.  The bullet penetrated the left side of his skull, causing a severe brain hemorrhage.  The pathologist who performed the autopsy determined that White had not died instantaneously from the gunshot wound, but more slowly from a massive loss of blood.  Police officers who arrived at the scene found White dead, lying face up behind his store counter in a pool of blood.  Donald Hall became a target of the investigation after two people who knew him contacted police in early January 1993 to give information implicating him.  One was his former wife, Donna Hicks, with whom he was then living.  The other was Kimball Morton who had first met Hall in the early 1980s when they shared a prison cell.

On April 2, 1993, Hall was indicted for first degree murder.  The state produced evidence at trial to show that Hall had planned and carried out the murder, disposed of incriminating evidence, and sold jewelry from White's store.  Donna Hicks testified that she woke around 10:00 a.m. on the day of the murder to discover that Hall and his car were gone.  Hall returned to their apartment around 11:00 a.m. and asked that she drive him to White's jewelry store to have a broken necklace fixed.  Hicks dropped him off at the store and parked about one block away.  She testified that Hall returned in less than ten minutes with a paper bag and blood on his hands.  She claimed that Hall told her he had shot White in the head when the jeweler bent over to examine the broken necklace.  He then filled the paper bag with a metal jewelry box, White's wallet, and the gun he had used.  She reported that Hall said several times that he had killed White because "[t]he only good witness is a dead witness."  That day Hall and Hicks disposed of the incriminating evidence and later pawned the jewelry.

Kimball Morton testified that in the week prior to White's death, he and Hall had gone to the jewelry store to have a necklace fixed. On that day Hall had talked to Morton about "going in there and robbing and killing Mr. White" and about how it would be "real easy" because there was "no security, no cameras, or nothin' …. All we have to do is walk in there and shoot him in the head." Morton said that he was reluctant to participate, and Hall dropped the subject. Morton also told police that about two weeks after the murder, Hall admitted to him that he had shot White in the head.

Hall testified at trial to a different story. He said that he had gone to White's store to retrieve a gold chain and two watches or their equivalent in cash. When White told him the watches were worthless and that he had thrown them away, Hall went behind the counter to demand their return. White pulled a gun from a desk drawer, and the two men struggled over it. The gun went off, and a bullet struck White in the head. Hall returned to the car and told Donna Hicks what had happened. He testified that she responded, "Well, we need that money or we need the stuff … [and] if you're not going in and get it, I'm going in and get it," and that she went back and stole the jewelry. On cross examination, the state discredited Hall's version by asking him about a letter he had written two months after the murder in which he had claimed that White was already dead when he entered the store. The prosecutor also had Hall reenact the struggle with White, and the state claims that the bullet would have discharged upwards if the gun had been fired as Hall indicated. The autopsy evidence showed that the bullet had entered White's skull in a downward direction.

The jury was instructed on first and second degree murder, but not second degree felony murder or involuntary manslaughter, and it convicted Hall of first degree murder. During the subsequent penalty phase of the trial, the state argued that the jury should impose the death penalty because Hall's long and violent criminal history demonstrated that he was incapable of being rehabilitated and that a pattern

of escalating criminal conduct had culminated in the murder of White.[2] The state also argued that Hall had exhibited no remorse for killing White and had left White to bleed to death instead of calling for medical assistance.[3] It called three witnesses at the penalty phase. The first testified that Hall had pointed a gun at her, and the second said that Hall had shot at him while fleeing from a burglary. The third was a police officer who testified that Hall had brandished a rifle and threatened to kill a policeman prior to his arrest in 1969 for displaying a dangerous and deadly weapon. Hall called two mitigating witnesses to testify on his behalf. John Mahan, Hall's son, testified that he and his father were close and that he would like to remain in contact with him. LeRoy Carpenter testified that he had met Hall when they were in prison and that they had maintained a close friendship in the intervening eleven years. Both witnesses asked the jury to spare Hall's life.

After its deliberations, the jury found two aggravating circumstances. These were that Hall had committed the murder for the purpose of avoiding lawful arrest and for the purpose of receiving money or any other thing of monetary value. The jury recommended death, and the trial court imposed a death sentence. Hall filed for post conviction relief under Missouri Supreme Court Rule 29.15, and a three day hearing was held. The trial court denied relief, and Hall appealed his conviction and the denial of post conviction relief to the Missouri Supreme Court. That court

---

[2]During the penalty phase, the jury found that Hall's prior criminal history included five serious assaultive criminal convictions stretching over two decades: burglary and grand stealing in 1965, displaying a dangerous and deadly weapon in 1969, exhibiting a deadly weapon in a rude, angry and threatening manner in 1981, second degree burglary in 1981, and receiving stolen property in 1986. The state had also introduced as evidence of an aggravating circumstance two other convictions he had in 1974 for first degree robbery and accessory to felonious assault, but the jury was not satisfied that these were established beyond a reasonable doubt.

[3]The bullet did not penetrate White's brain, and the state argued that White may have lived had he received immediate medical assistance.

affirmed after conducting a proportionality review of the sentence of death. State v. Hall, 982 S.W.2d 675, 689-90 (Mo. 1998) (en banc), cert. denied, 526 U.S. 1151 (1999).

Having exhausted his state remedies, Hall filed this petition in the district court seeking a writ of habeas corpus under 28 U.S.C. § 2254. He raised forty five separate grounds for relief. These included thirty two claims of ineffective assistance of counsel during the state proceedings, five claims of prosecutorial misconduct, and three claims of instructional errors. The other claims were based on evidentiary rulings, venue, Brady violations, shackles used during the penalty phase of trial, and failure of the Missouri Supreme Court to perform a proper proportionality review of his death sentence.

The district court denied the petition, but granted a certificate of appealability on sixteen claims. Thirteen of these claims are for ineffective assistance of counsel, either for ineffective cross examination of state witnesses or for failure to present certain evidence and witnesses at trial. In addition Hall claims that his due process rights were violated by the trial court's refusal to instruct on involuntary manslaughter, by his appearance in shackles during the penalty phase, and by failure to disclose Brady material. The certificate was later amended to permit Hall to appeal the denial of his requests for an evidentiary hearing, discovery, and leave to supplement the record. Hall's motions to expand the certificate to include many other issues, including ineffectiveness of appellate counsel, were denied.

II.

Consideration of Hall's petition, filed on May 31, 2000, is governed by 28 U.S.C. § 2254 (1994 & Supp. 1998), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, § 104, 110 Stat. 1214, 1218-19. Under AEDPA habeas relief cannot be granted on any claim "adjudicated

on the merits in State court proceedings unless the adjudication of the claim … resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to" clearly established Federal law if it either "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or if the state court arrives at a result opposite to one reached by the Supreme Court on "materially indistinguishable" facts. Williams v. Taylor, 529 U.S. 362, 405 (2000) (O'Connor, J., concurring, for the Court). An "unreasonable application" of the law is not the same as an incorrect application. Penry v. Johnson, 532 U.S. 782, 793 (2001). If the state court's application of clearly established federal law was not unreasonable, we may not grant habeas relief even if in our judgment its application was incorrect. Williams, 529 U.S. at 411.

The district court's denial of habeas relief is governed by the usual standards of review. We review any factual findings for clear error, and questions of law or mixed questions of law and fact are reviewed de novo. Kinder v. Bowersox, 272 F.3d 532, 538 (8th Cir. 2001).

A.

The certificate of appealability includes thirteen ineffective assistance of counsel claims. Hall claims that he was denied effective assistance of counsel because his trial counsel failed adequately to cross examine three of the government's witnesses during the guilt phase of his trial – Donna Hicks, Charles Ingram, and Kimball Morton. Hall also claims his counsel was ineffective during the guilt phase for failing to present Bob Gardner and Curt Hough as witnesses, and during the penalty phase for failing to present family members as mitigating witnesses and the expert testimony of a psychologist.

-6-

The governing law on the standard for ineffective assistance of counsel was set by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984), and the Missouri Supreme Court adopted that standard and articulated it in this way:

> In evaluating the performance of counsel under the first prong of the Strickland test, we note that actions by counsel that constitute sound trial strategy are not grounds for ineffective assistance claims. There is a presumption that any challenged action was sound trial strategy and that counsel rendered adequate assistance and made all significant decisions in the exercise of professional judgment. Even if counsel is found to have performed deficiently, the second prong of the Strickland test requires us to ask whether Hall was prejudiced by his counsel's poor performance. To prove prejudice, a defendant must show a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.

Hall, 982 S.W.2d at 680 (citations omitted); accord Strickland, 466 U.S. at 687-90, 694. In our circuit a habeas petitioner cannot build a showing of prejudice on a series of errors, none of which would by itself meet the prejudice test. Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir.), cert. denied, 519 U.S. 968 (1996). See also Scott v. Jones, 915 F.2d 1188, 1191 (8th Cir. 1990) (rejecting cumulative error as a basis for habeas relief for ineffective assistance claims because "each habeas claim must stand or fall on its own.").

The district court granted a certificate of appealability on several ineffective assistance claims connected to Donna Hicks' testimony: counsel failed to introduce notes and evidence on the issue of her motive to lie because of Hall's affair with Laura Loveless; counsel failed to call impeachment witnesses; counsel failed to offer a letter from Hicks to Hall expressing anger over his affair; and counsel failed to impeach Hicks by inconsistent statements including her use of the word "robbery" at trial, by forensic testing of Hall's car, and by her medical records.

1.

At the time of the murder Hall was living in Springfield with his former wife Donna Hicks, while he was also having an affair with Laura Loveless. Loveless was in a relationship with Hicks' son, David Mahan, with whom she had two children. Hall's counsel sought to discredit Hicks by showing that her testimony was motivated by anger over his affair with Loveless. Hicks admitted on cross examination that she was angry at Loveless, but she denied that she was testifying against Hall because of anger over the affair. Hall's counsel called John Mahan, the son of Hicks and Hall, who testified that his mother hated Loveless and that there were tensions between the two over Hall. Hall testified that Hicks had warned him against having an affair with Loveless and that her discovery of the affair may have motivated her to testify against him.

Hall claims that counsel was ineffective for failing to introduce other evidence that would have shown that Hicks had a motive to lie because of her anger over Hall's affair. This evidence included a note Hicks wrote to Hall while he was in jail, a letter in which Hicks discussed her intention to separate from Hall because of his affair, a letter John Mahan wrote to his father about a conversation he had had with his mother in which she expressed anger towards Hall, and the testimony of Loveless and Curt Hough.

There is some dispute whether the Missouri Supreme Court addressed all these claims, but we conclude that none of them show a Strickland violation. Hall's counsel testified that the decision not to call Loveless was a strategic choice because counsel did not believe she would testify favorably for Hall, in part because she was claiming that Hall had molested her daughter. Hall's counsel also testified that strategic considerations factored into the decision not to use the letter written by John Mahan because he had made it clear that he would not testify against his mother. Under Strickland, 466 U.S. at 690, "strategic choices made after thorough investigation of

-8-

law and facts relevant to plausible options are virtually unchallengeable ...."  In any event, the impact of any of these notes, letters, or witness testimony would have been minimal since it would have been cumulative on motive and would not have shown that the substance of Hicks' testimony was a lie.  A jury could have reasonably found from the evidence that Hicks had come forward to testify because of her anger and for revenge, but that the substance of her testimony was truthful.  Hall's counsel testified at the Rule 29.15 hearing that she had been unable to find any witnesses willing to testify that Hicks had actually lied, only that she was angry and had a motive to testify.  We conclude that failure to present cumulative evidence is neither contrary to nor an unreasonable application of the governing principles found in Strickland.

Hall also claims that his counsel was ineffective for failing to impeach Hicks with a prior inconsistent statement.  Prior to trial Hicks told police in a videotaped statement that Hall had gone to the jewelry store to commit a burglary, but she testified at trial that Hall had gone to commit a robbery.  At the Rule 29.15 hearing, Hall's counsel testified that she chose not to show the earlier videotaped statement by Hicks because it contained details about the murder and it was generally consistent with her trial testimony.  The Missouri Supreme Court determined that counsel's decision not to use the videotaped statement was a strategic decision based on an evaluation that more harm than benefit would come from its use at trial.  This was not an unreasonable application of federal law.  See  Strickland, 466 U.S. at 690.

Hall argues that forensic evidence from his car would have contradicted Hicks' testimony that blood was dripping from his hands and from White's wallet.  Hall raised this issue on his direct appeal to the Missouri Supreme Court, but the court did not rule on it.  The impact of this impeachment testimony would have been minimal.  Hall admitted at trial that he was involved in White's death, and he testified that he later washed blood off his hands with gasoline at a service station.  Hall's counsel was

not ineffective for failing to present this forensic evidence because this failure could not have prejudiced him.

Hall argues that his counsel was ineffective for failing to cross examine Hicks with information contained in her medical records. Halls contends that information about her drug use and electric shock therapy could have been used to impeach her testimony and raise questions about her ability to recall facts. In his appeal to the Missouri State Court, Hall raised the issue about Hicks' medical records in the context of an ineffective assistance claim for failure to litigate completely a motion related to her competency. In his petition to this court, however, Hall now seeks to shift the focus of these medical records to failure to impeach effectively. This claim is procedurally defaulted because "[i]t is 'the settled law of this Circuit that a habeas petitioner must have raised both the factual and legal bases for each ineffectiveness of counsel claim in the state courts in order to preserve the claim for federal review.'" King v. Kemna, 266 F.3d 816, 821 (8th Cir. 2001) (en banc) (quoting Flieger v. Delo, 16 F.3d 878, 885 (8th Cir.), cert. denied, 513 U.S. 946 (1994)). Even if Hall's claim were not defaulted, the impeachment evidence would have been merely cumulative and much of it had already been elicited at trial. As the Missouri Supreme Court observed in its discussion of Hicks' impeachment, "Hall's counsel forced Hicks to admit that she was using 'a lot of cocaine' for at least two weeks prior to the day of the crime and … that she has … undergone electroshock therapy, and has used Prozac." Hall, 982 S.W.2d at 685.

2.

The district court granted a certificate of appealability on three claims which Hall raised in a supplemental pro se brief submitted to the Missouri Supreme Court – that counsel was ineffective for failing to call Bob Gardner as a witness, failing to impeach Hicks with a prior inconsistent omission, and failing to impeach Kimball Morton with the testimony of Danny Marler. Since Hall was represented by counsel,

-10-

the Missouri Supreme Court refused to file his pro se brief and it did not address these claims. The state contends that these claims are procedurally barred because Hall has not shown cause and prejudice to overcome the default. See Wainwright v. Sykes, 433 U.S. 72, 84 (1977). A state procedural rule must be regularly adhered to for it to be an adequate state ground leading to a procedural bar. James v. Kentucky, 466 U.S. 341, 348-51 (1984). In Clemmons v. Delo, 124 F.3d 944, 948-49 & n.3 (8th Cir. 1997), cert. denied, 523 U.S. 1088 (1998), we noted that Missouri courts do not have "regularly applied criteria" for the acceptance or rejection of pro se briefs and therefore ruled that claims raised in this manner were not procedurally defaulted.[4] We need not consider whether that principle has survived AEDPA's more deferential standard because all these claims are without merit.

Hall claims that Bob Gardner would have testified that shortly before Hicks contacted the police he heard her say she was going to lie. As the district court noted, Hall presented no evidence that he had let his counsel know about Gardner or the statement allegedly made by Hicks. Even if Hall's claim were not forfeited by failure to inform his counsel, see Strickland, 466 U.S. at 691, the evidence about what Gardner heard Hicks say is hearsay. Gardner was not available to testify at the Rule 29.15 hearing because he had died seven months earlier. Hall now relies upon a hearsay affidavit in which counsel reports that Gardner told her that Hicks had informed him she was going to lie. This affidavit cannot serve as evidence as to what

---

[4]The Missouri Supreme Court has historically permitted defendants to file supplemental pro se briefs even when represented by counsel. See, e.g., State v. Peterson, 518 S.W.2d 1, 2, 4 (Mo. 1974); Mooring v. State, 501 S.W.2d 7, 10 (Mo. 1973); State v. Turley, 452 S.W.2d 65, 66-67 (Mo. 1970). Each district of the Missouri intermediate appellate court has a rule prohibiting the practice, however. See Carter v. State, 962 S.W.2d 462, 463 n.1 (Mo. Ct. App. 1998) (prohibited under Eastern District Court of Appeals Rule 380); State v. Hurt, 931 S.W.2d 213, 214 (Mo. Ct. App. 1996) (prohibited under Western District Rule XVI); Turner v. State, 784 S.W.2d 342, 344 n.3 (Mo. Ct. App. 1990) (prohibited practice in Southern District).

Gardner would have testified to under oath so Hall's petition for relief on this claim must fail.

Hall charges that his counsel was ineffective for failing to impeach Hicks with a prior omission which was inconsistent with her testimony at trial that Hall told her he had shot White because "[t]he only good witness is a dead witness." Hicks had not given this information prior to trial, and it was relevant on the issues of premeditation and the statutory aggravating factor that Hall had committed the murder for the purpose of preventing lawful arrest. The jury was presented with sufficient other evidence to find that Hall had committed first degree murder. Hall was seen in the vicinity of White's business on the morning of the crime, Morton's testimony indicated that Hall had been planning the murder, and the state discredited Hall's trial testimony that he had shot White by accident or in self defense. Although without this statement the penalty jury might not have found that Hall killed White for the purpose of preventing lawful arrest, he was not prejudiced because the jury found a separate aggravating factor (that Hall murdered White for the purpose of receiving money or anything of monetary value). Evidence that Hicks had not mentioned Hall's statement before trial would not have prevented the jury from finding the second aggravator.

Hall also complains that his counsel failed to impeach Kimball Morton's testimony by calling Danny Marler. Marler said at the Rule 29.15 hearing that Morton had told him that he could "get out of [his] prison sentence" if he testified against Hall and that he should beat him and report that it was done at Hall's direction. Marler admitted at the hearing that he had no knowledge whether the substance of Morton's testimony was true or false (that Hall had discussed robbing and murdering Bill White in advance and had later admitted to having committed the crime). Counsel's failure to offer Marler's testimony did not prejudice Hall because it would not have contradicted the most damaging aspects of Morton's testimony about Hall's statements before and after the murder. Furthermore, Hall's counsel had

-12-

already damaged Morton's credibility at trial by showing that he had received a $1,000 reward for providing information to police and that he stood to gain leniency from the state in exchange for his testimony. Under Strickland, Hall bears the burden of showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. Hall has not shown that the additional testimony offered by Marler would have made such a difference.

3.

Hall argues that his counsel was ineffective for not impeaching Charles Ingram with a police report that would have contradicted his trial testimony. The testimony of Ingram and of another witness, Charles Slater, placed Hall in the vicinity of White's store at around 10:30 a.m. on the day of the murder. According to the chronology developed by the state, Hall then returned to his apartment, talked Hicks into driving him back to the store, and proceeded to murder White. Evidence that Ingram and Slater had seen Hall in the vicinity earlier in the day was evidence of premeditation, but before trial Ingram told police that he had seen Hall near the store between 11:45 and 11:55, shortly before the murder.[5] At the Rule 29.15 hearing, Hall's trial counsel testified that she did not impeach Ingram with the police report because "[t]ime of death was not an issue," but counsel apparently failed to see that Ingram's testimony could show premeditation. Her failure to impeach him with the police report does not undermine confidence in the outcome, however, because the jury could have found Hall guilty of first degree murder without the testimony of Ingram, especially in light of Morton's rebuttal testimony. Ingram was also not necessary to place Hall at the crime scene because he admitted in his own testimony

---

[5]Although Slater's testimony was also inconsistent with his statement contained in a pretrial police report, Hall does not raise any claim regarding the failure to impeach him.

that he was present when White was shot. The Missouri Supreme Court's determination that counsel was not ineffective for failing to cross examine Ingram on his prior inconsistent statement was neither contrary to nor an unreasonable application of the governing principles found in <u>Strickland</u>.

4.

Hall raises two additional ineffective assistance claims related to his representation during the penalty phase of his trial: that his counsel failed to present family members as mitigating witnesses and expert testimony by a psychologist.

Hall's counsel called two mitigating witnesses during the penalty phase who both gave testimony that Hall was a kind, decent person with whom they would like to remain in contact. One of the witnesses was his son, John Mahan. The other was LeRoy Carpenter, a former convict whose main contact with Hall had been in prison. Hall claims that he was denied the right to effective assistance of counsel because of his counsel's failure to investigate and present as mitigating evidence the testimony of three other family members – Charles, Kelly, and Jeff Mooney. Based upon their testimony at the Rule 29.15 hearing, these three witnesses would have told the jury that Hall had been a kind, playful teenager with whom they had shared many happy memories, that he had grown up in a tough neighborhood, and that he did not learn who his real parents were until he was an adult.

The district court concluded that counsel's failure to contact Hall's brothers, Jeff and Kelly Mooney, was below the standard of performance required by the Constitution, and Hall argues the failure to contact his father, Charles Mooney, was also deficient since counsel had relied on a single phone conversation with his father's wife who said he would be of no help to his son. The Rule 29.15 testimony revealed that none of these family members was particularly close to Hall. Kelly Mooney testified that he did not even know that Hall had been on trial. Charles and Jeff

-14-

Mooney testified that they knew Hall had been charged with murder, but neither of them had been aware that the trial had taken place until it was over. None of the three men attempted to contact Hall's counsel to offer to testify. Given the emotional distance between them and Hall, we conclude that the Missouri Supreme Court's characterization of counsel's decision not to call these additional mitigating witnesses as "sound trial strategy" is not contrary to or an unreasonable application of clearly established federal law. Hall, 982 S.W.2d at 688; accord Strickland, 466 U.S. at 689.

Hall contends that trial counsel was ineffective for failing to present expert testimony from a psychologist during the penalty phase of the trial. Dr. Shirley Taylor, a psychologist whose deposition was taken as part of the Rule 29.15 proceeding, testified that if called at trial she would have revealed details of Hall's abusive childhood. Hall's penalty phase counsel testified at the Rule 29.15 hearing that the failure to call an expert in childhood development was not a strategic decision. The state contends, however, that Hall has presented no evidence that he made his trial counsel aware of his abusive childhood and that counsel cannot be held ineffective for failing to present information not provided by the petitioner. Strickland, 466 U.S. at 691.

The district court found that Hall had defaulted this claim by not raising it before the Missouri Supreme Court,[6] but he argues that the procedural bar should be excused because he can show that he is innocent of first degree murder by evidence

_____

[6]Hall argued before the district court that he had preserved this issue in his Second Rule 29.15 Motion and his Second Motion to Recall the Mandate. The district court held that neither mechanism was a proper way to present the issue because claims raised in a second proceeding are not properly presented to the Missouri courts. See generally Schleeper v. State, 982 S.W.2d 252 (Mo. 1998) (en banc), cert. denied, 526 U.S. 1093 (1999), and 527 U.S. 1026 (1999). Furthermore, a motion to recall the mandate cannot be used to allege ineffectiveness of *trial* counsel. Nave v. Delo, 62 F.3d 1024, 1031 (8th Cir. 1995).

-15-

negating the element of deliberation.  See Schlup v. Delo, 513 U.S. 298, 324 (1995) (permitting a court to consider defaulted claims "when the claimed injustice is that constitutional error has resulted in the conviction of one who is actually innocent of the crime.").  See also Amrine v. Bowersox, 128 F.3d 1222, 1226 (8th Cir. 1997) (en banc), cert. denied, 523 U.S. 1123 (1998) (permitting defendant to pass through Schlup gateway for evidentiary hearing where key witness recanted trial testimony).

Hall bases his claim of actual innocence on the forensic evidence of Dr. Jay Dix and the assertion by Bob Gardner that Donna Hicks planned to lie at trial.  This evidence is neither new nor sufficient.  Hall presented this evidence to the Missouri Supreme Court, which concluded that Dr. Dix's testimony did not controvert Hicks and did not support Hall's story that White had been shot accidentally or during a struggle.  Hall, 982 S.W.2d at 687-88.  Gardner's testimony is hearsay.  Without admissible new evidence negating the element of deliberation, Hall has not made a showing of actual innocence.  This claim is therefore procedurally barred.[7]

B.

1.

Hall claims his due process right to a fair trial was violated when he appeared in leg and waist shackles during the penalty phase of his trial.  When the jury was

---

[7]In any event, the failure to present testimony like that of Dr. Shirley Taylor was not prejudicial.  Dr. Taylor would have testified to psychological damage Hall suffered from secrets and whispers about his parentage, arbitrary whippings by his grandmother, and her refusal to let him play with other children.  According to Dr. Taylor, these psychological traumas had stunted Hall's emotional growth and left him "child like."  None of Hall's family members mentioned abuse inflicted by Hall's grandmother or any signs of psychological trauma, suggesting that Hall alone was the source.  The jury had already found him lacking in credibility at the initial guilt phase.

brought into the courtroom for the penalty phase, Hall was already there wearing handcuffs and shackles. The trial judge had the handcuffs removed at once but overruled counsel's objection to the continued use of the shackles, and they remained for the two to three hours that Hall was in the presence of the jury. The Missouri Supreme Court found that the trial court had not erred, citing State v. Kinder, 942 S.W.2d 313, 330 (Mo. 1996) (en banc), cert. denied, 522 U.S. 854 (1997), aff'd on denial of habeas, Kinder v. Bowersox, 272 F.3d 532, 545-46 (8th Cir. 2001) (use of restraints for courtroom security purposes is within the discretion of the trial court).

The two main constitutional concerns about the use of shackles during a trial are that they could impede a defendant's ability to participate and could suggest that the defendant is guilty. See Holbrook v. Flynn, 475 U.S. 560, 569 (1986); Illinois v. Allen, 397 U.S. 337, 344 (1970). Shackles and prison clothes are "inherently prejudicial" because they are "unmistakable indications of the need to separate a defendant from the community at large," Holbrook, 475 U.S. at 568-69, but the Supreme Court has not indicated whether the same concerns apply at the penalty phase of a trial. But see Duckett v. Godinez, 67 F.3d 734, 748 (9th Cir. 1995); Elledge v. Dugger, 823 F.2d 1439, 1450-52 (11th Cir. 1987) (per curiam), withdrawn in part on other grounds, 833 F.3d 250, 250 (11th Cir. 1987) (per curiam).

There is no evidence here that the jurors ever saw the leg and waist shackles. The record does not show whether Hall was already seated at the defense table or whether the shackles were visible to the jury. There is no evidence that Hall's ability to participate in the proceedings was hindered, and the immediate removal of the handcuffs ameliorated any prejudice. We do not find persuasive any contention that the use of shackles during the penalty phase would necessarily lead jurors to conclude that they must impose a death sentence. See, e.g., Elledge, 823 F.3d at 1450. These jurors had already found Hall guilty of first degree murder and could have found shackles to be a reasonable security measure. A trial court's decision to permit shackles for security reasons is "accorded broad discretion and may be reversed only

for abuse." <u>Hellum v. Warden</u>, 28 F.3d 903, 907 (8th Cir. 1994). On the record here the Missouri Supreme Court did not reach a conclusion contrary to clearly established federal law by not finding error in the overruling of the objection to shackles at the penalty phase.

2.

Hall claims his due process rights were violated by the trial court's refusal to instruct on involuntary manslaughter in addition to first and second degree murder, but this claim is procedurally defaulted because it was not raised on direct appeal. Hall contends that there is sufficient cause and prejudice to overcome the procedural default, but he has not met his burden to show prejudice. When a jury convicts on first degree murder after having been instructed on second degree murder, there has been no prejudice to the defendant by the refusal to submit a second degree felony murder instruction. <u>Kinder</u>, 942 S.W.2d at 330. <u>See also</u> <u>Six v. Delo</u>, 94 F.3d 469, 478 (8th Cir. 1996), <u>cert.denied</u>, 520 U.S. 1255 (1997). The Constitution does not entitle a capital murder defendant to instruction on every lesser included noncapital offense. <u>Schad v. Arizona</u>, 501 U.S. 624, 645-48 (1991), and the trial court need only give the jury an alternative to the all or nothing choice of capital conviction or acquittal. <u>Id.</u> at 647-48. <u>See also</u> <u>O'Rourke v. Endell</u>, 153 F.3d 560, 572 (8th Cir. 1998), <u>cert. denied</u>, 525 U.S. 1148 (1999) (finding no prejudice from counsel's failure to request a manslaughter instruction where jury findings demonstrated a rejection of the factual requisite to support the charge); <u>Kilgore v. Bowersox</u>, 124 F.3d 985, 995 (8th Cir. 1997), <u>cert. denied</u>, 524 U.S. 942 (1998) (omission of instruction on lesser included harmless where instructions gave the jury a choice between first and second degree murder and the jury convicted defendant of first degree murder). This claim for relief is barred.

Hall alleges that the State violated his due process rights under Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose police files on Hicks, White, and Morton. Hall's Brady claims were procedurally defaulted because he failed to raise them before the state courts. Such claims provide their own cause and prejudice to overcome the procedural bar, however, if the material in question was not discovered until after the deadline for presenting the claim to the state courts. Parkus v. Delo, 33 F.3d 933, 940 (8th Cir. 1994).

Under Brady, the state was required to provide information regarding any promises made in exchange for Donna Hicks' testimony. Hall seeks information about whether Hicks was a paid informant or provided information to the police about other unrelated crimes. This claim is apparently based on the hearsay statement of an investigator that Donna Hicks "may have" been an informant for the Springfield Police Department. Hall has failed, however, to make a sufficient showing that the state has any such information or that it was withheld.

Hall claims that police "intelligence files" on Morton were relevant to his impeachment. Hall makes no specific claims about how he would have used any such information, but we assume that he would have attempted to show that Morton was a regular police informant in order to discredit his testimony. Assuming such information existed and was admissible, we find that it would have had little additional impeachment value. At the time that Morton came forward to the police, he had not been charged with any crime, and Hall's counsel established on cross examination that Morton had received a $1000 reward and stood to gain leniency for crimes that he had meanwhile committed.

Hall claims that information on White in the police files would have been useful to his self defense argument because it would have corroborated White's

violent tendencies. Hall testified at trial that he knew of White's reputation for violence from two incidents – that White had gone to prison for the rape and murder of a police officer and that he had been the driver in a robbery attempt. A defendant pleading self defense "must show that he was aware of the specific act or acts of violence" at the time that he defended himself. State v. Waller, 816 S.W.2d 212, 216 (Mo. 1991) (en banc). Even if White's police file contained information about specific violent acts he had committed, this information either would have been cumulative to Hall's testimony or irrelevant if Hall was unaware of the acts at the time White was killed.[8]

## C.

Hall claims the district court erred when it denied his requests to supplement the state court record on his claims that the Missouri Supreme Court's proportionality review violated due process, that he had ineffective assistance of trial counsel, and that the state violated his Brady rights. Federal courts may conduct evidentiary hearings and supplement the state record only in extraordinary circumstances because of the obligation to defer to state courts' factual determinations. 28 U.S.C. § 2254(e)(1). To overcome this hurdle a petitioner must show that the claim involves a new rule of constitutional law made retroactive to his situation, or facts that could not have been discovered by due diligence, or sufficient facts to establish constitutional error by clear and convincing evidence. 28 U.S.C. § 2254(e)(2). Proportionality review satisfies due process when a state court compares the defendant's case with other similar cases. Kilgore, 124 F.3d at 986. Once this due process requirement is met, we will look no further. Chambers v. Bowersox, 157 F.3d 560, 570 (8th Cir. 1998), cert. denied, 527 U.S. 1029 (1999). Due process was

---

[8]Hall admitted at trial that he "got along with Bill White fairly well" until the day he was killed and that he later learned that White had not shot the police officer and that his rape charge had been dismissed.

-20-

satisfied here by the Missouri Supreme Court's comparison of Hall's case with other murders committed during robberies. Hall's claim is therefore noncognizable, and the district court properly denied his request for additional discovery and an expansion of the state record.

Hall also asked the district court to expand the record to consider the affidavit of an expert criminal defense attorney providing an assessment of the effectiveness of Hall's trial counsel and the reasonableness of the Missouri Supreme Court's application of Strickland. A petitioner is not entitled to an evidentiary hearing on ineffective assistance claims where he was given the opportunity to present evidence in the state courts following his conviction and has not shown any objective impediment affecting his ability to do so. Jones v. Delo, 56 F.3d 878, 884 (8th Cir. 1995). Hall's ineffective assistance claims were fully litigated before the state courts under the correct legal standard, and we conclude that the district court properly denied his request to expand the record.

III.

Having thoroughly considered all the claims for which a certificate of appealability has been granted, we find no grounds for habeas relief. The performance of Hall's counsel at his murder trial and penalty hearing was not so constitutionally deficient and prejudicial as to deprive him of a fair trial, his Brady claims are without merit, and he was not denied due process by the court's refusal to instruct on involuntary manslaughter or by his appearance in shackles during the penalty phase of trial. Hall's arguments about his right to supplement the record are also without merit. Accordingly, we affirm the judgment of the district court denying the petition for habeas corpus relief.

A true copy.

ATTEST:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.