**UNITED STATES of America, Plaintiff,**

v.

**Dustin Lee HONKEN, Defendant.**

**No. CR 01–3047–MWB.**

United States District Court, N.D. Iowa, Central Division.

July 21, 2004.

See, also, 2004 WL 3418693, 2004 WL 3418695.

Charles J, Williams, U.S. Attorney's Office, Cedar Rapids, IA, for Plaintiff.

Alfredo G. Parrish, Parrish Kruidenier Moss Dunn Montgomery Boles & Gribble, LLP, Des Moines, IA, for Defendant.

**MEMORANDUM OPINION AND ORDER REGARDING THE GOVERNMENT'S MOTION TO HAVE THE DEFENDANT WEAR SHACKLES AT TRIAL**

BENNETT, Chief Judge.

**TABLE OF CONTENTS**

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1013
 A. Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1013
 1. The 1993 case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1013
 2. The 1996 case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1013
 3. Indictments in the present case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1014
 B. The Motion To Shackle The Defendant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1018
 1. Procedural background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1018
 2. Factual background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1018

II. LEGAL ANALYSIS........................................................1023
 A. The Evidentiary Issue ...........................................1023
 1. Arguments of the parties .....................................1023
 2. Analysis ....................................................1023
 a. Rules 1101(d) and 46(b) ...................................1023
 b. The pertinent record ....................................1024
 B. The Motion To Shackle The Defendant.............................1026
 1. Arguments of the parties .....................................1026
 2. Applicable standards ........................................1027
 a. Supreme Court precedent ..................................1027
 b. Standards applied by the lower courts ....................1029
 i. Analysis for the guilt phase ...........................1029
 ii. Analysis for the penalty phase .......................1031
 3. Application of the standards .................................1031
 a. Locking brace ...........................................1031
 b. Additional security personnel ...........................1032
 c. Shackles ................................................1032
 d. Stun belt ...............................................1035
 e. Stun belt and shackles ..................................1038

III. CONCLUSION .........................................................1039

In this death penalty case, involving the alleged murder of five witnesses to the defendant's drug-trafficking or other alleged criminal conduct,[1] the government has filed under seal a motion to have the defendant wear shackles and other restraints at trial. In resolving the motion, the court must balance, *inter alia*, the need for such extreme security measures against the defendant's rights to a fair trial, the assistance of counsel, and the presumption of innocence.

## I. INTRODUCTION

### A. Background

#### 1. The 1993 case

As in the rulings on other pre-trial motions, the background to the present motion begins with a survey of the prior prosecutions of defendant Dustin Lee Honken in this judicial district. Honken was first prosecuted for drug-trafficking offenses in this district in 1993 in Case No.

CR 93–3019 ("the 1993 case"). As the Eighth Circuit Court of Appeals explained,

> In April 1993, a grand jury in the Northern District of Iowa indicted appellee for conspiracy to distribute methamphetamine. After the disappearance of one or more prospective prosecution witnesses, the government dismissed the indictment.

*United States . v. Honken*, 184 F.3d 961, 963 (8th Cir.), *cert. denied*, 528 U.S. 1056, 120 S.Ct. 602, 145 L.Ed.2d 500 (1999). Thus, the first prosecution of Honken in this district did not lead to a conviction.

#### 2. The 1996 case

Honken was again indicted on drug-trafficking charges on April 11, 1996, this time with co-defendant Timothy Cutkomp, in Case No. CR 96–3004–MWB ("the 1996 case"). Count 1 of the Indictment in the 1996 case charged Honken and Cutkomp with conspiracy, between about 1993 and February 7, 1996, to distribute, manufac-

---

1. The charges on which the government has given notice of intent to seek the death penalty are murder while engaging in a drug-trafficking conspiracy ("conspiracy murder"), in violation of 21 U.S.C. § 848(e)(1)(A) and 18

U.S.C. § 2, and murder while engaging in or working in furtherance of a continuing criminal enterprise ("CCE murder"), also in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2.

ture, and attempt to manufacture 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 100 grams or more of pure methamphetamine. Indictment in Case No. CR 96–3004–MWB (N.D.Iowa). Count 2 of the original Indictment in the 1996 case charged Honken with possessing and aiding and abetting the possession of listed chemicals, in violation of 21 U.S.C. § 841(d) and 18 U.S.C. § 2, and Count 3 charged possession and aiding and abetting the possession of drug paraphernalia intending to use such paraphernalia to manufacture and attempt to manufacture methamphetamine and listed chemicals, in violation of 21 U.S.C. § 843(a)(6) and 18 U.S.C. § 2, respectively. *Id.,* Counts 2 & 3. A superseding indictment filed later in the 1996 case restated the first three charges and added a fourth charge of attempting to manufacture methamphetamine. *See* Superseding Indictment in Case No. CR 96–3004–MWB (N.D.Iowa).

Eventually, in 1997, Honken pleaded guilty to the conspiracy charge and the charge of attempting to manufacture methamphetamine, *i.e.,* Counts 1 and 4, and the government dismissed Counts 2 and 3. *See, e.g., Honken,* 184 F.3d at 963. The court held an episodic sentencing hearing on December 15 and 16, 1997, and February 17, 18, and 24, 1998. Honken testified under oath on February 18 and 24, 1998. After the government's appeal of the sentence originally imposed by the undersigned, *see id.,* Honken was resentenced on January 25, 2000. Honken then unsuccessfully appealed his sentence, *see United States v. Honken,* 2 Fed.Appx. 611, 2001 WL 66287 (8th Cir.2001). Honken is now serving his sentence on Counts 1 and 4 in the 1996 case.

### 3. *Indictments in the present case*

The present prosecution began with the filing of a seventeen-count indictment against Honken on August 30, 2001, which brought a variety of charges arising from Honken's alleged murder and solicitation of murder of witnesses to his alleged drug-trafficking and other criminal activity, which had, for example, allegedly brought the 1993 prosecution to its abrupt conclusion and had been intended to impede prosecution of the 1996 case. On August 23, 2002, a Superseding Indictment was handed down in this case, amending Counts 8 through 17. *See* Superseding Indictment (docket no. 46). The court will examine the charges in this case in more detail as a prelude to a discussion of the admissibility of certain evidence at trial of those charges.

Counts 1 through 5 of the Superseding Indictment charge "witness tampering." More specifically, each count alleges that Honken "did willfully, deliberately, maliciously, and with premeditation and malice aforethought, unlawfully kill" one of five witnesses: Gregory Nicholson, Lori Duncan (Nicholson's girlfriend), Amber Duncan and Kandi Duncan (Lori Duncan's daughters, ages 6 and 10), and Terry DeGeus. Count 1 alleges that Gregory Nicholson was murdered

1) with the intent to prevent Gregory Nicholson from attending or providing testimony at an official proceeding in the Northern District of Iowa, Case Nos. 93–20 M and CR 93–3019 [the 1993 case]; 2) with intent to prevent Gregory Nicholson from communicating to a law enforcement officer of the United States, information relating to the commission or possible commission of federal offenses, including: the distribution of methamphetamine, the manufacture of methamphetamine and conspiracy to distribute and manufacture methamphetamine, a Schedule II Controlled Substance, in violation of Title 21 United States Code, Sections 841 and 846; and 3) with intent to retaliate against Gregory Nicholson for providing information

to law enforcement relating to the commission or possible commission of federal offenses, including: the distribution of methamphetamine, the manufacture of methamphetamine and conspiracy to distribute and manufacture methamphetamine, a Schedule II Controlled Substance, in violation of Title 21 United States Code, Sections 841 and 846[;] and 4) with intent to retaliate against Gregory Nicholson for testifying before the Federal Grand Jury ·investigating the drug trafficking activities of DUSTIN LEE HONKEN and others, which killing is a first degree murder as defined by Title 18, United States Code, Section 1111.

This is in violation of Title 18, United States. Code, Sections 1512(a)(1)(A) & (C); 1513(a)(1)(A) & (B) and 1111.

Superseding Indictment, Count 1. Counts 2, 3, and 4 allege that Lori Duncan, Kandi Duncan, and Amber Duncan, respectively, were murdered

with the intent to prevent [them] from communicating to a law enforcement officer of the United States, information relating to the commission or possible commission of federal offenses, that is: the tampering with Gregory Nicholson, a federal witness, in violation of Title 18, United States Code, Section 1512; and DUSTIN LEE HONKEN's unlawful contact with Gregory Nicholson, in contempt of court and in violation of DUSTIN LEE HONKEN's conditions of federal pretrial release in Case Nos. 93–20 M and CR 93–3019 [the 1993 case], in violation of Title 18, United States Code, Sections 3148 and 401, which killing of [each witness] is a first degree murder, as defined by Title 18, United States Code, Section 1111.

This is in violation of Title 18, United States Code, Sections 1512(a)(1)(C), 1512(a)(2)(A), and 1111.

Superseding Indictment, Counts 2–4. Count 5 alleges that Terry DeGeus was murdered

with intent to prevent Terry DeGeus from communicating to a law enforcement officer of the United States, information relating to the commission or possible ˙commission of federal offenses, that is: the distribution of methamphetamine, manufacture of methamphetamine and conspiracy to distribute and manufacture methamphetamine, a Schedule II Controlled Substance, in violation of Title 21 United States Code, Sections 841 and 846, which killing of Terry DeGeus is a first degree murder, as defined by Title 18, United States Code, Section 1111.

This is in violation of Title 18, United States Code, Sections 1512(a)(1)(C), 1512(a)(2)(A), and 1111.

Superseding Indictment, Count 5. The Superseding Indictment includes, in support of Counts 1 through 5, allegations of "Findings under 18 U.S.C. § 3591 and 3592," which the court finds it unnecessary to repeat here, because the government is not seeking the death penalty against Honken on the "witness tampering" charges.

Count 6 charges Honken with soliciting the murder of witnesses, as follows:

Between about June 10, 1996, and February 24, 1998, in the Northern District of Iowa and elsewhere, DUSTIN LEE HONKEN did solicit, command, induce, and endeavor to persuade Dean Donaldson and ˙Anthony Altimus to engage in conduct constituting a felony that has as an element, the use, attempted use, and threatened use of physical force against the person of another in violation of the laws of the United States, that is: 1) the murder of Timothy Cutkomp, with the intent to prevent Timothy Cutkomp's attendance or testi-

mony at a federal drug trial in the Northern District of Iowa, Case No. CR 96–3004 [the 1996 case], in violation. of Title 18, United States Code, Sections 1512 and 1111; and 2) the murder of Daniel Cobeen with the intent to prevent Daniel Cobeen from attending or testifying at a federal drug trial in the Northern District of Iowa, Case No. CR 96–3004 [the 1996 case], in violation of Title 18, United States Code, Section 1512 and 1111, with the intent that Dean Donaldson and Anthony Altimus engage in such conduct and under circumstances strongly corroborative of that intent.

This is in violation of Title 18, United States Code, Section 373(a)(1).

Superseding Indictment, Count 6.

Count 7 charges Honken with conspiracy to tamper with witnesses and to solicit the murder of witnesses, as follows:

Between about July 1, 1993, and continuing thereafter, until about 2000, in the Northern District of Iowa and elsewhere, DUSTIN LEE HONKEN did knowingly and willfully combine, conspire, confederate, and agree with other persons known and unknown to the grand jury, to commit the following offenses against the United States:

1. To kill or attempt to kill another person with the intent to prevent the attendance or testimony of that person at an official proceeding, in violation of Title 18, United States Code, Section 1512(a)(1)(A);

2. To kill or attempt to kill another person with the intent to prevent communication by a person to a law enforcement officer of information relating to the commission or possible commission of a federal offense or violations of conditions of release pending judicial proceedings, in violation of Title 18, United States Code, Section 1512(a)(1)(C);

3. To knowingly use intimidation, physical force, threats, or otherwise corruptly to persuade another person with the intent to influence, delay, or prevent testimony of a person at an official proceeding, in violation of Title 18, United States Code, Section 1512(b)(1);

4. To knowingly use intimidation, physical force, threats, or otherwise corruptly persuade another person with the intent to hinder, delay, or prevent communication to a law enforcement officer of information relating to the commission or possible commission of a federal offense or a violation of conditions of release pending judicial proceedings, in violation of Title 18, United States Code, Section 1512(b)(3); and

5. To solicit, command, induce, and endeavor to persuade a person to commit a felony that has as an element the use, attempted use or threatened use of physical force against the person or property of another, specifically violations of 18 U.S.C. § 1512(a)(1)(A) & (C) (murder and attempted murder of individuals with intent to prevent them from testifying or communicating information to law enforcement officials) and 1512(b)(1) & (3) (knowingly using, or attempting to use, intimidation, force, threats or corrupt persuasion of an individual with intent to prevent them from testifying or communicating information to law enforcement officials) with the intent that such person engage in such conduct and under circumstances strongly corroborative of that intent, in vio-

lation of Title 18, United States Code, Section 373.

Superseding Indictment, Count 7. Count 7 includes fourteen numbered paragraphs of allegations of "Background to Overt Acts" and thirty numbered paragraphs of allegations of "Overt Acts" in furtherance of the conspiracy, which the court will not quote here.

Honken is also charged in Counts 8 through 12 of the Superseding Indictment in this case with five counts of murder while engaging in a drug-trafficking conspiracy ("conspiracy murder"), in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. As they presently stand, each of these Counts charges the "conspiracy murder" of one of five people—Gregory Nicholson, Lori Duncan, Amber Duncan, Kandi Duncan, and Terry DeGeus, respectively—as follows:

On or about July 25, 1993 [November 5, 1993, as to DeGeus], in the Northern District of Iowa, DUSTIN LEE HONKEN, while knowingly engaging in an offense punishable under Title 21, United States Code, Sections 846 and 841(b)(1)(A), that is between 1992 and 1998 DUSTIN LEE HONKEN did knowingly and unlawfully conspired [sic] to: 1) manufacture 100 grams or more of pure methamphetamine and 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine and 2) distribute 100 grams or more of pure methamphetamine and 1000 grams or more of a mixture or substance containing a detectable amount of methamphetamine, intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of [the named individual], and such killing resulted.

All in violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2.

Superseding Indictment, Counts 8 through 12.

Counts 13 through 17 of the Superseding Indictment in this case charge Honken with the murder of the same five individuals, respectively, while engaging in or working in furtherance of a continuing criminal enterprise ("CCE murder"), also in violation of 21 U.S.C. § 848(e)(1)(A) and 18 U.S.C. § 2. Those charges are as follows:

On or about July 25, 1993 [November 5, 1993, as to DeGeus], in the Northern District of Iowa, DUSTIN LEE HONKEN, while engaging in and working in furtherance of a continuing criminal enterprise in violation of Title 21, United States Code, Section 848(c), intentionally killed and counseled, commanded, induced, procured, and caused and aided and abetted the intentional killing of [the named individual], and such killing resulted.

The continuing criminal enterprise DUSTIN LEE HONKEN engaged in and worked in furtherance of was undertaken by DUSTIN LEE HONKEN in concert with five or more other persons including, but not limited to, Timothy Cutkomp, Gregory Nicholson, Terry DeGeus, Angela Jane Johnson, and Jeffery Honken. In the organization, DUSTIN LEE HONKEN occupied a position of organizer, supervisor or other position of management. The criminal enterprise involved the commission of a continuing series of narcotics violations under Title 21, United States Code, Section 801 et. [sic] seq. occurring between 1992 and 2000, specifically:

[18 numbered paragraphs omitted].

From this continuing criminal enterprise, DUSTIN HONKEN and others derived substantial income and resources.

All in violation of Title 21, United States Code, Section 848(e)(1)(A) and Title 18, United States Code, Section 2. Superseding Indictment, Counts 13 through 17.

On June 10, 2003, the government filed its Notice Of Intent To Seek The Death Penalty Under 21 U.S.C. § 848 (docket no. 120), thereby giving notice of the government's intent to seek the death penalty on the "conspiracy murder" and "CCE murder" offenses in Counts 8 through 17. On July 21, 2003, this court denied Honken's motion to dismiss Counts 8 through 17 on the basis of "former jeopardy" in light of his prior conviction in the 1996 case. *See United States v. Honken,* 271 F.Supp.2d 1097 (N.D.Iowa 2003). Therefore, all of the charges in the Superseding Indictment are currently set for trial beginning on August 16, 2004.

### B. The Motion To Shackle The Defendant

#### 1. Procedural background

At issue in this ruling is the government's June 2, 2004, Motion To Have Defendant Wear Shackles At Trial (docket no. 268). In its motion, the government seeks an order of the court requiring the defendant to wear leg shackles while in court and while being transported to and from the courtroom and cellblock for the duration of his trial and, further, that the shackles be secured to the floor while the defendant is in court. The defendant resisted the motion on June 18, 2004.

The court originally set this and other motions for a hearing at which the defendant was expected to participate by teleconference. However, upon Honken's request to be personally present for the hearing on this motion, the court reset this motion for a separate, closed hearing on July 15, 2004. At the hearing on July 15, 2004, the United States was represented by C.J. Williams, Assistant United States Attorney, from Cedar Rapids, Iowa, and Thomas Henry Miller, Assistant Iowa Attorney General, from Des Moines, Iowa. Defendant Dustin Lee Honken was personally present and was represented by Alfredo G. Parrish of Parrish, Kruidenier, Moss, Dunn, Montgomery, Boles & Gribble, L.L.P., in Des Moines, Iowa; Leon F. Spies of Mellon & Spies in Iowa City, Iowa; and Charles Rogers of Wyrsch, Hobbs & Mirakian, P.C., in Kansas City, Missouri.

The government's motion to have the defendant wear shackles at trial is now fully submitted.

#### 2. Factual background

At the hearing, the government presented the testimony of two witnesses, John Graham, an agent with the Iowa Division of Narcotics Enforcement (DNE), and Roger Arechiga, the United States Marshal for the Northern District of Iowa. The government also offered, without objection, a copy of Mr. Arechiga's Declaration in support of the government's motion as Government's Exhibit 1, and the court admitted that Declaration.

The government offered thirteen other exhibits to which Honken did object. Exhibits 2 through 8 are copies of grand jury testimony of several witnesses in either 2000 or 2001. Exhibit 9 is a summary of information learned by Special Agent William Basler of the Iowa Division of Criminal Investigation during interviews conducted with inmates at the United States Penitentiary in Florence, Colorado (USP Florence), although the dates of those interviews are not indicated. Exhibit 10 is notes by a law enforcement officer on a telephone interview with a confidential informant at the United States Penitentiary in Marion, Illinois (USP Marion), where Honken has been most recently incarcerated on his prior convictions. Exhibits 11, 12, and 13 are handwritten original letters

from that confidential informant to law enforcement officers with typewritten transcriptions. Finally, Exhibit 14 is notes by an FBI agent on another interview with the confidential informant. Exhibits 10 through 14 were added in the course of the hearing.[2] Honken based his objections to all of the exhibits on his contention that the exhibits are hearsay. He objected to Exhibits 10 through 14 on the further ground that information had been elicited from him by the confidential informant in violation of his right to counsel. The court admitted Exhibits 2 through 14 subject to the defendant's objection. The court will rule on the admissibility of these exhibits in its legal analysis, below.

In its legal analysis, the court will also make essential findings of fact, once the court has established the appropriate legal standards for its determination of whether or not shackles or other restraints on the defendant are required during trial. For now, the court will survey the factual background to the pertinent issues from the evidence offered at the hearing on July 15, 2004, as well as other pertinent evidence presented in prior prosecutions of Honken, and prior proceedings in this case. Specifically, the court incorporates herein by reference its findings in its ruling on the government's motion for an anonymous jury, and also takes note of the evidence presented at Honken's sentencing on the charges in the 1996 indictment, which, *inter alia*, involved evidence of Honken's intimidation of and violence towards witnesses and his attempt to escape from the Woodbury County Jail.

Because Agent Graham's testimony was offered primarily to lay a foundation for Exhibits 2 through 9, the focus of the present factual background is the testimony of Roger Arechiga, the Acting United States Marshal for the Northern District of Iowa. Much of Marshal Arechiga's testimony was consistent with, and indeed, consisted of amplification of, his Declaration submitted with the government's motion, in which Marshal Arechiga presented the reasons for his professional judgment that additional restraints on Honken are required during trial.

More specifically, Marshal Arechiga testified that, in his opinion, heightened security measures are needed in this case for the following reasons: (1) Honken has previously attempted to escape from the Woodbury County Jail and has recently had training in martial arts and body contortion, which all suggest his desire and capacity to attempt to escape during trial; (2) Honken faces murder charges and the possibility of the death penalty, such that,

---

**2.** During the hearing, the court took a recess to conduct a sealed *ex parte* telephone conference with members of the "taint team" for the United States Attorney's Office for the Northern District of Iowa in a sealed miscellaneous case in which the "taint team" sought guidance from the court on when and how to release to the parties in this case the information about Mr. Honken recently provided by the confidential informant at USP Marion. Pursuant to procedures of the "taint team," the prosecutor in this action had not previously been aware of the information obtained from the confidential informant, the telephone conference in the sealed miscellaneous case, or indeed, of the filing or existence of the sealed miscellaneous case itself. At the conclusion of the telephone conference in the sealed miscellaneous case, the court ruled that the materials relating to the confidential informant should be disclosed to the attorneys in this case. Therefore, the court provided the parties with copies of that material, an opportunity to peruse that material, and an opportunity to make whatever motions the parties deemed appropriate concerning admissibility of that material as part of the record on the government's motion for the defendant to wear shackles. As noted in the body of this opinion, the government moved to admit the material from the confidential informant in support of its motion, and Honken objected to the admission of that material.

in Marshal Arechiga's opinion, Honken has "nothing to lose" by attempting to escape during trial or by engaging in other sorts of violent behavior while in or being transferred to or from the courtroom; (3) Honken has previously been involved with violent associates both in and out of prison who could be, and have been in the past, recruited to assist him with an escape attempt; (4) Honken has a record of infractions while incarcerated; (5) the trial will require management of several incarcerated witnesses and the management and protection of nine witnesses currently in witness protection; and (6) the trial will involve heightened demands on the Marshals Service owing to the sheer number of trial participants. In his testimony, Marshal Arechiga explained that several of the persons identified on Honken's witness list are among the most dangerous prisoners that he is aware of in federal custody, so that there must be adequate security measures to maintain control of incarcerated witnesses as well as the defendant. Upon cross-examination, however, Marshal Arechiga conceded that Honken has been well-behaved in all of his prior court appearances and in all of his interactions with deputies, so far, during transportation to and from such proceedings.

Marshal Arechiga testified in more detail than his Declaration provided about various means of restraining Honken during the trial and during his transfer to and from the courtroom. Marshal Arechiga initially stated his preference for "leg irons" (shackles) on the defendant bolted to the floor while the defendant is in the courtroom, because, in his professional opinion, that combination of restraints is the most effective means of providing security, concealing from the jury the fact that the defendant is restrained, and allowing the defendant to participate fully in the trial. According to Marshal Arechiga, leg shackles bolted to the floor would make it possible for a smaller number of deputies to be in court and to respond to other threats to security or "diversions" in the courthouse, because of the relative certainty that the defendant "was not going anywhere."

The primary drawbacks to using leg shackles bolted to the floor, Marshal Arechiga testified, are that such restraints may make it difficult for the defendant to stand at appropriate times during the proceedings and may require some measures to conceal the restraints from jurors. As to the first difficulty, under questioning from the court, Marshal Arechiga acknowledged that, if so instructed by the court, the leg shackles and bolt could be configured with sufficient chain to allow the defendant to stand naturally when required to do so. As to the second difficulty, Marshal Arechiga suggested screening the leg shackles from the jurors' view with "table skirts," which would also be used on the prosecution table, and "taping" or "wrapping" the chains to prevent them from making noticeable noises when the defendant moves. The defense table was "skirted" in this fashion during the hearing on July 15, 2004, for demonstrative purposes. At the court's request, Marshal Arechiga readily undertook to explore better means than taping or wrapping to ensure that the chains do not make noise, should leg shackles be ordered. Marshal Arechiga pointed out that, whatever measures are used to conceal use of leg shackles from the jurors, members of the public might still be aware that the defendant is chained and bolted to the floor, owing to the position of spectators behind the defendant, and that little could be done about that, without obscuring the view of monitoring marshals as well. He also conceded that members of the public might, and probably would, include some jurors' family members, and that, human nature being what it is, such family members would not be able to refrain from telling jurors about the

restraints on the defendant. He testified that it might be possible to avoid some potential prejudice by clearing the jurors and spectators from the courtroom, and indeed, from the floor of the courthouse on which the trial courtroom is located, prior to moving the defendant in leg shackles. He also noted that, if further measures had to be taken to subdue a defendant already in leg shackles during a courtroom attack or outburst, there was a substantial risk of physical injury to both the defendant and the deputy marshals attempting to subdue him.

Although Marshal Arechiga expressed his own personal preference "for iron," he acknowledged that younger deputies tended to prefer the "high tech" restraint of a "stun belt" or "stun vest." Marshal Arechiga explained that a stun belt can administer to an obstreperous defendant, by remote control, up to 50,000 volts of electric shock at approximately one-half ampere. One advantage of the stun belt, according to Marshal Arechiga, is that it permits the monitoring deputy to administer a milder "warning" shock several seconds before subjecting a defendant to the full shock, so that a situation can potentially be controlled in its incipiency. Moreover, he explained that such a device is worn by the defendant under his clothes, so that it is not apparent to jurors, or spectators for that matter, unless it is used. Because the stun belt is less obtrusive, Marshal Arechiga suggested that use of the stun belt could allow the trial to proceed rather more quickly, as less management of the jury and the public would be required before the defendant could be moved. Marshal Arechiga also testified that the stun belt allows a defendant full use of his hands and the opportunity to move naturally, as well as the opportunity to consult with counsel without impediment. Finally, Marshal Arechiga testified that it was his belief, based on trials of the stun belt on academy trainees, that there were very few men who could continue an attack or continue to resist officers while being stunned.

Disadvantages of the stun belt, according to Marshal Arechiga, include the need for the monitoring deputy to maintain one-hundred per cent vigilance; the need to rely on technology with a possibility, however slight, of failure; and the possibility of accidental discharge of the stun. The last concern was minimal, he testified, because the Marshals Service has estimated that the rate of erroneous or accidental discharge of the stun belt during use in the field is only about 0.01 percent. Although Honken's defense team asserted that use of the stun belt on a defendant would likely cause the defendant to defecate or urinate, Marshal Arechiga testified that he was not aware that such loss of control of bodily functions was at all common; rather, he testified that a "stunned" defendant would commonly make unpleasant noises and jerk or twitch around. Nevertheless, he conceded that seeing a defendant stunned would be disconcerting to jurors and members of the public. He recommended that a defendant be cuffed "while moving," even while wearing a stun belt, just as an added precaution.

Marshal Arechiga also testified to his understanding of a "locking" knee or leg brace as an alternative to leg shackles or a stun belt, although he confessed to no personal familiarity with such a restraint, because it is not authorized for use by the Marshals Service. Because use of such a device is not authorized by the Marshals Service, he testified that he did not know of any Marshal or deputy with any training in its use. Nevertheless, he explained that such a restraint "locks" if the defendant engages in inappropriate or too extensive motion, such as leaping from his chair. Marshal Arechiga testified that he understood a locking brace would make it very

difficult for a defendant to run. However, he also opined that an accidental activation, from inadvertent movement by the defendant exceeding the scope allowed by the brace, would require some delay to reset. Marshal Arechiga testified that, like leg shackles or a stun belt, a locking brace would generally allow a defendant to use his hands and legs and to consult with counsel, and except in the event of a lockup, would be unobtrusive. He testified, further, that, also like leg shackles, a locking brace would involve a higher risk of physical injury to deputies and the defendant if additional measures were required to subdue a defendant during an outburst or altercation. Under questioning from defense counsel, Marshal Arechiga testified that he could attempt to obtain a waiver of the Marshals Service's ban on locking braces and could also attempt to find out how much training would be required before such braces could be used. Even if a locking brace could otherwise be a viable alternative, he pointed out that he would still have to train additional deputies in the use of a locking brace as various security teams "rotated" during the course of trial.

The final alternative that Marshal Arechiga described was the use of substantially more deputies in the courtroom to provide security and to monitor the defendant. Marshal Arechiga testified that even he had found such a measure "oppressive" to the courtroom atmosphere. Moreover, he explained that such a procedure would be a substantial financial and human resources problem for a relatively small district, like the Northern District of Iowa.

To summarize his initial testimony, Marshal Arechiga expressed a preference for use of leg shackles all of the time, with the leg shackles bolted to the floor while the defendant was in court. He initially identified use of a stun belt alone as his second choice. He rejected use of a locking brace, because it was not authorized by the Marshals Service and he had no deputies trained in its use. When asked by the court to explain why he was treating a stun belt and leg shackles as alternatives, Marshal Arechiga testified that he had been advised by his legal counsel that the stun belt and leg shackles were mutually exclusive, so that he could recommend use of one or the other, but not both. The court then assured Marshal Arechiga that he could use the security measures that he was ordered to use by the court, regardless of whether the court's order conformed to the advice of legal counsel for the Marshals Service.[3] Therefore, after questioning by the parties and the court, Marshal Arechiga departed from the advice of his legal counsel to opine that his personal preference, and indeed, his specific request, would be that the defendant wear *both* a stun belt and leg shackles bolted to the floor while in court and a stun belt with handcuffs, but not leg shackles, while he was being moved within the courthouse. The government then orally amended its motion to reflect this request by Marshal Arechiga.

Although Honken offered no evidence at the hearing, he initially stated his preferences to be the following: (1) use of a leg brace only; (2) use of a stun belt only; (3) use of a leg brace and stun belt together; and (4) use of leg shackles bolted to the floor, but without a stun belt. Because the government could not agree to a leg brace and preferred a higher level of restraint

---

**3.** Indeed, the court has not found any cases holding that a stun belt and leg shackles are mutually exclusive; rather, the court has found one federal appellate case expressly authorizing use of both in appropriate circumstances. *United States v. Joseph*, 333 F.3d 587, 590–91 (5th Cir.), *cert. denied*, 540 U.S. 973, 124 S.Ct. 446, 157 L.Ed.2d 322 (2003).

than Honken, the parties were unable to reach an agreement on their recommendation to the court for restraint of Honken during trial. On the other hand, the parties were able to reach a stipulation that all incarcerated witnesses, called by either the government or the defendant, would appear in leg shackles, handcuffs, and belly chains while testifying.

## II. LEGAL ANALYSIS

### (Including Essential Findings Of Fact)

#### A. The Evidentiary Issue

##### 1. Arguments of the parties

The first issue that the court must resolve is whether it can consider all of the challenged exhibits, Exhibits 2 through 14, offered by the government at the July 15, 2004, hearing. The government conceded that these exhibits were hearsay and did not assert that they fall within any recognized hearsay exception. The government argued that these exhibits are nevertheless admissible pursuant to Rule 1101(d) of the Federal Rules of Evidence and Rule 46(b) of the Rules of Criminal Procedure. The government contended that, read together, these rules suggest that a hearing on trial security measures is a collateral proceeding to the determination of the defendant's guilt, and as such, is not subject to the Rules of Evidence. Honken vehemently disagreed, pointing out that Rules 1101(d) and 46(b) apply to proceedings regarding conditions of release, but say nothing about trial security proceedings. Honken asserted that the Rules of Evidence should apply when the government is asking for measures that would be fundamentally at odds with the presumption of innocence.

##### 2. Analysis

###### a. Rules 1101(d) and 46(b)

▮ Rule 1101(d) of the Federal Rules of Evidence provides, in pertinent part, as follows:

**(d) Rules inapplicable.** The rules [of evidence] (other than with respect to privileges) do not apply in the following situations:

\* \* \* \* \* \*

**(3) Miscellaneous proceedings.** Proceedings for extradition or rendition; preliminary examinations in criminal cases; sentencing, or granting or revoking probation; issuance of warrants for arrest, criminal summonses, and search warrants; and proceedings with respect to release on bail *or otherwise.*

FED.R.EVID. 1101(d)(3) (emphasis added). The court finds nothing in this rule supporting the government's contention that the Rules of Evidence are inapplicable.

First, this is not one of the proceedings expressly identified in the rule as a "miscellaneous proceeding" to which the Rules of Evidence are inapplicable. Second, from the structure of this portion of the rule, it is apparent that the "or otherwise" language does *not* create a "catchall" category of "miscellaneous proceedings" to which the Rules of Evidence do not apply. Rather, that language modifies only conditions of release, that is, the Rules of Evidence do not apply to proceedings with respect to release *on bail or on other conditions.* Indeed, the 1972 Advisory Committee Notes on the proposed rules strongly support such a reading by noting, in pertinent part, that "[p]roceedings with respect to release on bail or otherwise do not call for application of the rules of evidence." *Id.,* Advisory Committee Notes on 1972 Proposed Rules. From this statement, it is clear that the Advisory Committee intended the "or otherwise" language to relate to conditions of release, not to create a *separate* category of "miscellaneous proceedings." Obviously, the situation would be different if the "or otherwise" language had been preceded by a semi-

colon, as were all of the other categories of "miscellaneous proceedings" identified in the Rule, but that is not the situation. Because Rule 1101(d) does not, either expressly or by reasonable implication, make the Rules of Evidence inapplicable to determination of courtroom security measures during the trial of a capital case, that rule does not support the government's argument that the Rules of Evidence are inapplicable to the present proceeding, and hence, does not support the admissibility of Exhibits 2 through 14.

■ Similarly unavailing is the government's assertion that Rule 46(b) of the Federal Rules of Criminal Procedure makes the Rules of Evidence inapplicable to proceedings on the present motion. Rule 46(b) provides as follows:

**(b) During Trial.** A person released before trial continues on release during trial under the same terms and conditions. But the court may order different terms and conditions or terminate the release if necessary to ensure that the person will be present during trial or that the person's conduct will not obstruct the orderly and expeditious progress of the trial.

FED.R.CRIM.P. 46(b). Even though this rule authorizes the court to order conditions necessary to ensure that "a person's conduct will not obstruct the orderly and expeditious progress of the trial," this rule is not applicable here. The rule, on its face, applies to "[a] person released before trial," but Honken is a person incarcerated before trial. Thus, this rule likewise does not support the government's contention that the Rules of Evidence are inapplicable to the proceedings on the present motion, and hence, does not support the admissibility of Exhibits 2 through 14.

The court has found no decision in which a court held or even suggested that either Rule 1101(d) or Rule 46(b), read separately or together, would make the Rules of Evi-

dence inapplicable to a proceeding such as the one now before the court. For these reasons, the court rejects the only basis for admission of Exhibits 2 through 14 asserted by the government. Therefore, Exhibits 2 through 14 are inadmissible hearsay pursuant to Rule 802 of the Federal Rules of Evidence.

### b. The pertinent record

■ Notwithstanding the failure of the government's arguments in support of the admission of Exhibits 2 through 14, the court must consider the broader question of whether the Rules of Evidence apply to this proceeding and what, precisely, the court may consider in making its determination of the restraints to which the defendant may be subjected during trial. The court finds it rather strange that the Rules of Evidence do not apply to "preliminary examinations in criminal cases," "sentencing," or "proceedings with respect to release on bail or otherwise," see FED.R.EVID. 1101(d), but would nevertheless appear to apply to proceedings to determine appropriate courtroom security measures during trial. Therefore, the court finds that some probing of the reasons that the Rules of Evidence do not apply to the listed categories of proceedings may be illuminating.

At the time when Rule 1101(d) was drafted, the Advisory Committee noted that the Rules of Evidence did not apply to sentencing, even where a life sentence or death penalty was at stake, because "due process does not require confrontation or cross-examination in sentencing ... and that the judge has broad discretion as to the sources and types of information relied upon." FED.R.EVID. 1101, Advisory Committee Notes, 1972 Proposed Rules, Note to Subdivision (d) (citing *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949)). If the Rules of Evidence do not apply to a matter with such conse-

quences for the defendant's life and liberty, it seems counterintuitive that they would apply to a preliminary determination of security measures at trial. There may be some justification for the inapplicability of the Rules of Evidence at sentencing, because the presumption of innocence no longer applies, but that justification does not apply to the pre-trial proceedings to which Rule 1101(d) also expressly makes the Rules of Evidence inapplicable. Like sentencings, preliminary examinations and proceedings with respect to release on bail also affect the defendant's liberty, but at a time when the defendant *is* entitled to the presumption of innocence. Nevertheless, such pre-trial "miscellaneous proceedings" are also exempt from the Rules of Evidence, because, for example, the Advisory Committee recognized that "hearsay testimony is . . . customarily received at [preliminary] examinations," and "references to the weight of the evidence against the accused" in the context of bail proceedings "clearly do not have in view evidence introduced at a hearing under the rules of evidence." *Id.* The justification for the inapplicability of the Rules of Evidence in such proceedings must be that there is a pressing need for preliminary determinations on whether or not to detain the defendant, so that the decision must be made on the basis of the best information reasonably and realistically available. Requiring application of the Rules of Evidence in such proceedings would turn them into "mini-trials" on both the ultimate charges against the defendant and collateral matters that certainly go to the risk to society that the defendant might pose, but do *not* go to the defendant's guilt or innocence on the charges then pending. In such preliminary proceedings, it would be absurd and irresponsible for the court to ignore credible but otherwise inadmissible evidence that the defendant poses a risk of flight or violence. Moreover, where trial will ultimately con-

demn or vindicate the defendant, based on application of not just the Rules of Evidence but the full panoply of due process protections, the trial itself is a "post-deprivation remedy" for the imposition of restraints pre-trial according to lesser standards. The present proceedings are similar to such pre-trial proceedings, and the same rationale for the inapplicability of the Rules of Evidence would, therefore, seem to apply to these proceedings.

Just as importantly, a decision of the Eighth Circuit Court of Appeals on security measures at trial states that a trial court is not always required to hold a hearing or to make explicit findings before imposing specific restraints on the defendant during trial; rather, the court is " 'given sufficient discretion to meet the circumstances of each case.' " *United States v. Stewart,* 20 F.3d 911, 915 n. 8 (8th Cir.1994) (quoting *Illinois v. Allen,* 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970)). Specifically, "the district court [i]s entitled to rely on the face of the indictment, . . . the record that had been made during [the defendant's] arraignment in the same case, and its observations of matters that are reflected in the trial transcript." *Id.* The Rules of Evidence plainly do not apply to either the face of the indictment or the defendant's arraignment, but trial courts in this Circuit are nevertheless authorized to rely upon them in making a determination of security measures at trial.

Thus, although the court will not consider Exhibits 2 through 14 out of an abundance of caution, the court nevertheless concludes that it may consider other pertinent evidence presented in prior proceedings involving Honken, including his sentencing on the charges in the 1996 indictment and proceedings on the government's motion for an anonymous jury, because evidence from those proceedings is

at least as reliable as the face of the indictment and evidence from the defendant's arraignment. *Cf. Stewart,* 20 F.3d at 915 n. 8. Indeed, in both Honken's prior sentencing and the proceedings on the motion for an anonymous jury, Honken had the opportunity for cross-examination, even if the Rules of Evidence did not expressly apply. The evidence from those proceedings shows, *inter alia,* that Honken intimidated and used violence against witnesses, attempted to escape from the Woodbury County Jail, and attempted to enlist the aid of associates inside and outside of the Jail for both purposes.

■ In the alternative, the court finds that Marshal Arechiga indicated, at least by inference, that the information he relied upon to make his security recommendations is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *See* FED.R.EVID. 703. Thus, Marshal Arechiga's "opinion or inference" that specific restraints on the defendant are required during trial is admissible, even if the "facts or data" upon which his "opinion or inference" is based are not. *Id.* The government did not rely on this ground for the admissibility of Marshal Arechiga's opinions about the need for additional courtroom security in this case, perhaps because the government, quite surprisingly, was not equipped with a copy of the Federal Rules of Evidence at the hearing on July 15, 2004. Pursuant to Rule 703, the court concludes that, even if it cannot properly consider evidence from prior proceedings involving Honken, the court can nevertheless consider Marshal Arechiga's opinions that additional security measures are required in this case, because Honken poses a danger to trial participants and a threat of escape.

Therefore, out of an abundance of caution, the court will not rely upon Exhibits 2 through 14, but will rely on evidence from prior proceedings against Honken and the opinion of Marshal Arechiga that heightened security measures are required in this case, because Honken poses a danger to trial participants and a threat of escape.

### B. The Motion To Shackle The Defendant

With the evidentiary issue resolved, the court turns to the merits of the government's motion to shackle the defendant during trial, as that motion was orally amended during the hearing on July 15, 2004. Thus, the question presented is whether placing Honken in a stun belt and shackles bolted to the floor while in the courtroom and a stun belt and handcuffs and/or shackles while being moved to or from the courtroom, or some lesser level of restraint, is appropriate in this case. The court's analysis of that question begins with the arguments of the parties.

### 1. Arguments of the parties

In its written arguments in support of this motion, the government itself summarized the three prongs of its argument to be the following: (1) that the court has a compelling interest in maintaining courtroom safety and decorum; (2) that Honken poses a serious threat to this interest; and (3) that ordering Honken to wear leg shackles at all times while not in his cell and to have those leg shackles bolted to the floor is the most appropriate means to achieve the court's compelling interest in increased courtroom security without prejudicing the jury towards the defendant. The government asserts that Honken's threat to the compelling interest in courtroom safety arises from the following: (a) the severity of the crimes with which he is charged; (b) the threats of violence that he has made against witnesses and others; (c) the violent crimes to which he has pleaded guilty and his escape attempt while in police custody; and (d) the determination

by Marshal Arechiga that Honken will attempt acts of violence or escape while in the courtroom. In his written arguments, Honken responded that, while he recognizes that the court is vested with broad discretion in assuring courtroom security, the government's allegations are not and cannot be borne out by the evidence; the measures advocated by the government are unnecessary; and those measures would deprive him of his right to a fair trial and the assistance of counsel.

At the hearing on July 15, 2004, the government modified its requested security measures to match those ultimately proposed by Marshal Arechiga. Thus, the government requests that Honken wear a stun belt at all times while in court or while being moved to or from the courtroom, that he also wear handcuffs while in transit, and that he also wear leg shackles bolted to the floor while in the courtroom. During the hearing, the government also pointed out that some of the concerns about "prejudice" from the possibility that jurors or members of the public might see Honken in leg shackles is ameliorated by the fact that jurors and members of the public will learn that Honken is incarcerated. For that reason, the government argued that seeing Honken in shackles would come as no surprise to jurors, and indeed, might be regarded as simply routine. The government also asserted, based on Marshal Arechiga's testimony, that leg shackles and bolting in addition to the stun belt while in court were reasonably justified to improve security in light of the number of available deputies, should there be a disturbance or "diversion." At the hearing, Honken reiterated his contention that a stun belt, shackles, and being bolted to the floor while in court are simply not justified. While he concedes that shackles and a stun belt are probably justified while he is being moved within and to and from the courtroom, he contends that bolting him to the floor or making him wear a stun belt

as well as shackles while in court is simply excessive. Apparently conceding that a locking brace is not a viable alternative, he also modified his personal preference to be a stun belt alone, contingent on good behavior, because he asserted that the stun belt was the only measure reasonably justified by the evidence.

## 2. Applicable standards

### a. Supreme Court precedent

The Supreme Court has identified the issues that must be balanced in the court's determination of courtroom security measures. In *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), the Supreme Court held that a trial judge had not abused his discretion by removing the defendant from his own trial. *Allen*, 397 U.S. at 347, 90 S.Ct. 1057. Before so holding, the Court identified the interests at issue, the range of permissible ways for a court to respond to an obstreperous defendant, and the effect of one of those ways, binding and gagging, on the pertinent interests:

It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of

the courtroom until he promises to conduct himself properly.

Trying a defendant for a crime while he sits bound and gagged before the judge and jury would to an extent comply with that part of the Sixth Amendment's purposes that accords the defendant an opportunity to confront the witnesses at the trial. But even to contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort. Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold. Moreover, one of the defendant's primary advantages of being present at the trial, his ability to communicate with his counsel, is greatly reduced when the defendant is in a condition of total physical restraint. It is in part because of these inherent disadvantages and limitations in this method of dealing with disorderly defendants that we decline to hold with the Court of Appeals that a defendant cannot under any possible circumstances be deprived of his right to be present at trial. However, in some situations which we need not attempt to foresee, binding and gagging might possibly be the fairest and most reasonable way to handle a defendant who acts as Allen did here.

*Allen,* 397 U.S. at 343–44, 90 S.Ct. 1057.

Subsequently, in *Holbrook v. Flynn,* 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986), the Supreme Court identified more clearly the constitutional concerns involved, then surveyed the extent to which it had previously determined that certain security measures impinge upon those rights:

Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." *Taylor v. Kentucky,* 436 U.S. 478, 485, 98 S.Ct. 1930, 1934, 56 L.Ed.2d 468 (1978). This does not mean, however, that every practice tending to single out the accused from everyone else in the courtroom must be struck down. Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct. To guarantee a defendant's due process rights under ordinary circumstances, our legal system has instead placed primary reliance on the adversary system and the presumption of innocence. When defense counsel vigorously represents his client's interests and the trial judge assiduously works to impress jurors with the need to presume the defendant's innocence, we have trusted that a fair result can be obtained.

Our faith in the adversary system and in jurors' capacity to adhere to the trial judge's instructions has never been absolute, however. We have recognized that certain practices pose such a threat to the "fairness of the factfinding process" that they must be subjected to "close judicial scrutiny." *Estelle v. Williams,* 425 U.S. 501, 503–504, 96 S.Ct. 1691, 1692–1693, 48 L.Ed.2d 126 (1976). Thus, in *Estelle v. Williams,* we

noted that where a defendant is forced to wear prison clothes when appearing before the jury, "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment." *Id.*, at 504–505, 96 S.Ct. at 1693. Since no "essential state policy" is served by compelling a defendant to dress in this manner, *id.*, at 505, 96 S.Ct. at 1693, this Court went no further and concluded that the practice is unconstitutional. This close scrutiny of inherently prejudicial practices has not always been fatal, however. In *Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), the Court emphasized that a defendant may be prejudiced if he appears before the jury bound and gagged. "Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold." *Id.*, at 344, 90 S.Ct. at 1061. Yet the Court nonetheless observed that in certain extreme situations, "binding and gagging might possibly be the fairest and most reasonable way to handle" a particularly obstreperous and disruptive defendant. *Ibid.*

*Holbrook*, 475 U.S. at 567–68, 106 S.Ct. 1340. In *Holbrook*, the Supreme Court concluded that the practice in question, the conspicuous presence of guards in the courtroom, was not inherently prejudicial and that the defendant had failed to establish actual prejudice. *Id.* at 572, 106 S.Ct. 1340.

It is upon these discussions of the pertinent interests that the lower courts have subsequently premised their discussions of the standards that courts must use to determine the appropriate level of restraint, if any, to be placed on a criminal defendant during trial.

### b. Standards applied by the lower courts

**i. Analysis for the guilt phase.** The Eighth Circuit Court of Appeals has concluded from Supreme Court precedent that, where "inherently prejudicial" measures are at issue, "close judicial scrutiny" is required to ensure that the inherently prejudicial measures are "necessary to further an 'essential state interest.'" *Hellum v. Warden, U.S. Penitentiary–Leavenworth*, 28 F.3d 903, 907 (8th Cir.1994). Measures that are not "inherently prejudicial," on the other hand, are permissible unless they pose " 'unacceptable risk of prejudice.'" *Id.* (quoting *Holbrook*, 475 U.S. at 571, 106 S.Ct. 1340). Generally, whether a measure is "inherently prejudicial" depends upon the extent of the threat it poses to the " 'fairness of the factfinding process.'" *United States v. Stewart*, 20 F.3d 911, 915 (8th Cir.1994) (quoting *Holbrook*, 475 U.S. at 568, 106 S.Ct. 1340). As to the interests required to justify security measures, "[c]learly, the safety of a state's courtrooms is an essential state interest justifying the use of restraints." *Gilmore v. Armontrout*, 861 F.2d 1061, 1071 (8th Cir.1988), *cert. denied*, 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989). The same must surely be said for the safety of federal courtrooms.

■ The Eighth Circuit Court of Appeals has distilled the applicable analysis into two steps: First, the court must consider, in its discretion, whether restraints are necessary to prevent the defendant from escaping and to protect others in the courtroom; second, the court must consider whether placing the defendant in restraints prejudices the defendant. *See Zeitvogel v. Delo*, 84 F.3d 276, 283 (8th Cir.), *cert. denied*, 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986); *Hellum*, 28 F.3d at 907 ("The question before us is whether the grounds for additional security which

existed at the time the security measures were taken justify any prejudice which they created."); *Stewart*, 20 F.3d at 915 (courts "must balance the possibility of prejudice against the need to maintain order in the courtroom and custody over incarcerated persons") (citing *Holbrook*, 475 U.S. at 571–72, 106 S.Ct. 1340). Other Circuit Courts of Appeals have also expressly added a *third* step to the analysis, requiring consideration of whether less restrictive alternatives are available, *see, e.g., Gonzalez v. Pliler*, 341 F.3d 897, 902 (9th Cir.2003); *Packer v. Hill*, 291 F.3d 569, 583 (9th Cir.2002), *rev'd on other grounds sub nom. Early v. Packer*, 537 U.S. 3, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (reversing appellate court's determination that charge to deadlocked jury was coercive); *United States v. Durham*, 287 F.3d 1297, 1304 (11th Cir.2002), although this court believes that consideration of less restrictive alternatives should necessarily be part of a determination of the "need" for a particular security measure.

■ Not only must the court exercise its discretion to determine the "need" for security measures, the court must also exercise its discretion to determine "the extent of security measures during trial." *United States v. Carter*, 815 F.2d 1230, 1231 (8th Cir.1987). Similarly, " '[c]ourts must do the best they can to evaluate the likely effects of a particular procedure, based on reason, principle, and common human experience.' " *Stewart*, 20 F.3d at 915. Indeed, other Circuit Courts of Appeals have expressly held that the *court* must make the determination of whether or not to use restraints on a defendant at trial; that decision cannot be deferred to corrections officers or the United States Marshals Service. *See, e.g., Gonzalez*, 341 F.3d at 902 ("The use of physical restraints is subject to close *judicial*, not law enforcement, scrutiny. It is the duty of the trial court, not correctional officers, to make the affirmative determination, in

conformance with constitutional standards, to order the physical restraint of a defendant in the courtroom.") (emphasis in the original); *United States v. Mayes*, 158 F.3d 1215, 1226 (11th Cir.1998) (the court may not "blindly" defer to the United States Marshal's recommendations), *cert. denied sub nom. Byrd v. United States*, 525 U.S. 1185, 119 S.Ct. 1130, 143 L.Ed.2d 123 (1999). On the other hand, "the court [i]s ... entitled to rely in part upon the expertise and experience of the Marshals Service in making its decision," even though "it is ultimately the district court's duty to decide upon the appropriateness of using physical restraints during the trial of a criminal defendant." *Mayes*, 158 F.3d at 1226. Thus, "trial judges should not blindly defer to the recommendations of law enforcement officials as to the appropriateness of [security measures] without independently reviewing the facts and circumstances thought to warrant such a security measure and carefully considering the legal ramifications of that decision." *Id.* In short, the court's decision to agree with the recommendation of the Marshals Service must be an informed one. *Id.*

While the Eighth Circuit Court of Appeals has indicated that, to assist appellate analysis, the trial court should articulate the reasons for imposing the security measures, *Hellum*, 28 F.3d at 907, other Circuit Courts of Appeals make such an articulation of reasons mandatory. *See, e.g., United States v. Joseph*, 333 F.3d 587, 591 (5th Cir.) ("The district court is required to state, outside the presence of the jury, the reasons for which it has chosen to shackle the defendant."), *cert. denied*, 540 U.S. 973, 124 S.Ct. 446, 157 L.Ed.2d 322 (2003); *United States v. Durham*, 287 F.3d 1297, 1305 (11th Cir.2002) ("[T]he district court is required to place the reasons for its decision to use such [security] measures on the record.").

■ **ii. Analysis for the penalty phase.** In *Hall v. Luebbers,* 296 F.3d 685 (8th Cir.2002), *cert. denied sub nom. Hall v. Roper,* 539 U.S. 911, 123 S.Ct. 2267, 123 S.Ct. 2267 (2003), the Eighth Circuit Court of Appeals noted that the "two main constitutional concerns about the use of shackles during a trial" are "that they could impede a defendant's ability to participate and could suggest that the defendant is guilty." *Hall,* 296 F.3d at 698. However, the court noted that "the Supreme Court has not indicated whether the same concerns apply at the penalty phase of a trial." *Hall,* 296 F.3d at 698. The court apparently assumed that a trial court's decision to permit shackles on the defendant for security reasons during the penalty phase should be subject to the same "broad discretion" applicable to a determination of the need for such measures during the guilt phase. *See id.* at 699. Specifically, the court addressed precisely the same issues in its analysis of penalty-phase security measures that it had recognized as pertinent to guilt-phase security measures:

> There is no evidence here that the jurors ever saw the leg and waist shackles. The record does not show whether Hall was already seated at the defense table or whether the shackles were visible to the jury. There is no evidence that Hall's ability to participate in the proceedings was hindered, and the immediate removal of the handcuffs ameliorated any prejudice. We do not find persuasive any contention that the use of shackles during the penalty phase would necessarily lead jurors to conclude that they must impose a death sentence. These jurors had already found Hall guilty of first degree murder and could have found shackles to be a reasonable security measure.

*Hall,* 296 F.3d at 698–99 (citation omitted). Thus, this court assumes that the same considerations that animate the discussion of the appropriate restraints on Honken during the guilt phase of his trial must also animate the discussion of the appropriate restraints to be placed on him during the penalty phase, if any.

### 3. Application of the standards

#### a. Locking brace

■ The Ninth Circuit Court of Appeals has subjected the use of a locking leg brace to the same "need" and "prejudice" analysis described above. *See Packer v. Hill,* 291 F.3d 569, 583 (9th Cir.2002) (finding that the use of the leg brace was not based on sufficient evidence of necessity, and that the court failed to consider less restrictive alternatives, but that these errors were harmless, because none of the jurors remembered seeing the leg brace), *rev'd on other grounds sub nom. Early v. Packer,* 537 U.S. 3, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (reversing appellate court's determination that the charge to a deadlocked jury was coercive). However, this court declines to consider the use of a locking brace, because it is not a reasonably available alternative in this case. Marshal Arechiga testified that use of a locking brace is not authorized by the United States Marshals Service and that he has no deputies, and knows of no Marshals or deputies, trained in its use. Furthermore, he testified that he would be required to obtain a waiver of the Marshals Service's prohibition on use of locking braces before he could train deputies in their use. Finally, additional officers would have to be trained in use of the braces with each rotation of officers assigned to Honken's security team. Just as "the court [i]s … entitled to rely in part upon the expertise and experience of the Marshals Service in making its decision," *Mayes,* 158 F.3d at 1226, the court believes that it is entitled to rely upon the Marshals Service's admitted *lack* of expertise and experience with a particular security mea-

sure as a ground for rejecting use of that security measure in a capital case.

Even were the court to consider a locking brace, the court would conclude that it is not sufficient, based on the evidence presented, to provide the level of security necessary in this case, and based on the potential for prejudice to the defendant from use of such a device. First, the record adequately supports a finding that Honken has attempted and is likely to attempt to escape from custody with the intention not only of escape but of engaging in violence against witnesses, law enforcement officers, prosecutors, and possibly other trial participants. A leg brace is not, in this court's view, sufficient on the present record to satisfy the essential governmental interests in safety and security of the courtroom and trial participants and prevention of any escape attempt. Second, owing to the lack of present authorization for and training in the use of such a device, an essentially "experimental" use of such a device in this capital murder case, with this defendant, is not appropriate. Moreover, under these circumstances, the risk of accidental or inadvertent lock-up, causing delay to the trial and the prejudice arising from the jurors' discovery that Honken is so restrained, is simply too high.

#### b. Additional security personnel

 Neither of the parties asked that the court simply rely on additional security personnel to maintain security over the defendant and to protect the public. The court, therefore, considers such a measure only to be sure that it has considered less restrictive means to meet essential governmental interests in safety of the courtroom and trial participants.

The court recognizes that the Supreme Court has held that even conspicuous use of additional security officers is not inherently prejudicial. *Holbrook*, 475 U.S. at 572, 106 S.Ct. 1340. Even so, had a party requested that the court simply rely on additional security personnel in this case, the court would have rejected such measures as insufficient and not reasonably available. Marshal Arechiga adequately addressed the strains such a course would put on the financial and human resources of this district. Moreover, the court finds that additional security personnel alone would not adequately address the security and safety concerns presented by this defendant in this courthouse. For one thing, merely relying on the presence of additional security personnel does not provide the immediate deterrence or restraint of inappropriate conduct by Honken that the court finds is appropriate in this case, based on the record evidence of his threats to witnesses, prosecutors, and law enforcement officers, and his attempted escape from the Woodbury County Jail. Moreover, there is a very substantial risk of prejudice to Honken's rights to a fair trial, and a risk of physical injury to him and to security personnel, if the additional security personnel are required to subdue him. Therefore, the court must turn to admittedly more restrictive alternatives.

#### c. Shackles

 The first realistic alternative presented by the parties is shackling of the defendant during trial and bolting him to the floor. The Eighth Circuit Court of Appeals has consistently held that "[s]hackles and prison clothes are 'inherently prejudicial' because they are 'unmistakable indications of the need to separate a defendant from the community at large.'" *Hall*, 296 F.3d at 698 (quoting *Holbrook*, 475 U.S. at 568–69, 106 S.Ct. 1340). Thus, such a security measure must be given "close judicial scrutiny." *Hellum*, 28 F.3d at 907. However, "[a] trial court's decision to permit shackles for security reasons is 'accorded broad discre-

tion and may be reversed only for abuse.' " *Hall,* 296 F.3d at 699 (quoting *Hellum,* 28 F.3d at 907).

In *Zeitvogel v. Delo,* 84 F.3d 276, 283 (8th Cir.), *cert. denied,* 479 U.S. 871, 107 S.Ct. 243, 93 L.Ed.2d 168 (1986), the Eighth Circuit Court of Appeals performed a succinct "need" and "prejudice" analysis for use of leg shackles, as follows:

> The trial court acted well within its discretion in deciding restraints were necessary to prevent Zeitvogel from escaping and to protect others in the courtroom. At the time of trial, Zeitvogel had murder, rape, and assault convictions and had escaped from state custody once before. *See Gilmore v. Armontrout,* 861 F.2d 1061, 1071 (8th Cir.1988), *cert. denied,* 490 U.S. 1114, 109 S.Ct. 3176, 104 L.Ed.2d 1037 (1989). Further, the trial court's decision to require restraints did not prejudice Zeitvogel. Even without seeing the shackles, the jury would have learned from the trial evidence that Zeitvogel was an inmate. *See Estelle v. Williams,* 425 U.S. 501, 507, 96 S.Ct. 1691, 1694–95, 48 L.Ed.2d 126 (1976). After all, Zeitvogel killed Dew in the maximum security area of the Missouri State Penitentiary.

*Zeitvogel,* 84 F.3d at 283. In other decisions, the court upheld the use of shackles for similar reasons. *See Hellum,* 28 F.3d at 908 (the defendant was properly handcuffed and shackled at all times, because of his record of three escape attempts, one of which was successful; his offers of money in exchange for assistance with at least one prior escape attempt; evidence of outside assistance for escape attempts; and the defendant's expression of an "extreme desire for freedom and a willingness to engage in violence," including threats to take a deputy hostage if he got a chance to escape); *Stewart,* 20 F.3d at 915 (shackles were appropriate where the defendant was charged with a "vicious assault upon a witness in the courtroom"; the defendant's continued demonstration of disrespect for the court; and the defendant's "hostile attitude" during preliminary proceedings); *Gilmore,* 861 F.2d at 1071 (the use of leg shackles was justified where the defendant was charged with several capital murders and had one prior conviction for such an offense); *accord Gonzalez v. Pliler,* 341 F.3d 897, 900 (9th Cir.2003) (" 'In all [ ] cases in which shackling has been approved,' we have noted, there has been 'evidence of disruptive *courtroom* behavior, attempts to escape from custody, or a *pattern* of defiant behavior toward corrections officials and judicial officers.' ") (quoting *Duckett v. Godinez,* 67 F.3d 734, 749 (9th Cir.1995), *cert. denied,* 517 U.S. 1158, 116 S.Ct. 1549, 134 L.Ed.2d 651 (1996)), with emphasis added in *Gonzalez* ); *United States v. Joseph,* 333 F.3d 587, 591 (5th Cir.) ("This court has held that an essential state interest justifying shackling is found where there is a danger of escape or injury to the jury, counsel, or other trial participants.") (citing *United States v. Hope,* 102 F.3d 114, 117 (5th Cir.1996)), *cert. denied,* 540 U.S. 973, 124 S.Ct. 446, 157.L.Ed.2d 322 (2003)).

The court readily acknowledges that there is no record of *courtroom* disruption by Honken, nor any evidence of dangerous or disrespectful conduct toward deputy U.S. Marshals while transporting Honken. *Compare Gonzalez,* 341 F.3d at 900 (considering such evidence as a ground for shackling). However, Honken has a vested interest in good behavior at this point in the process, for instance, to try to obtain less restrictive security measures at trial and to forward any plans to escape or to engage in courtroom violence. Moreover, his present good behavior is sharply at odds with some of his other conduct, including the offenses with which he is presently charged. *See Stewart,* 20 F.3d

at 915 n. 8 ("[T]he district court [i]s entitled to rely on the face of the indictment, ... the record that had been made during [the defendant's] arraignment in the same case, and its observations of matters that are reflected in the trial transcript."). Honken has or has allegedly attempted to escape and to recruit persons inside and outside of the jail to assist him in both his escape attempt and his attempts to murder or intimidate witnesses, law enforcement officers, and prosecutors, and there is sufficient evidence in the record to provide a credible basis for those allegations. *Compare Zeitvogel*, 84 F.3d at 283 (the defendant was properly shackled in light of the violent crimes with which he was charged and his prior escape attempts); *Hellum*, 28 F.3d at 908 (the defendant was properly shackled where he had a record of escape attempts including attempts involving efforts to obtain outside assistance); *Gilmore*, 861 F.2d at 1071 (the defendant was properly shackled where he was charged with several capital murders); *accord Joseph*, 333 F.3d at 591 ("This court has held that an essential state interest justifying shackling is found where there is a danger of escape or injury to the jury, counsel, or other trial participants."). Several of the witnesses against whom Honken has made threats have been placed in witness protection, but will be present at some point in the trial, providing Honken with a rare opportunity for violence against them. Therefore, the court finds that the use of shackles on Honken during trial is justified to further the essential governmental interests in safety of the courtroom and trial participants and prevention of Honken's escape from custody. *See Hellum*, 28 F.3d at 907 (where "inherently prejudicial" measures are at issue, "close judicial scrutiny" is required to ensure that the inherently prejudicial measures are "necessary to further an 'essential state interest' ").

The court likewise finds that bolting Honken's shackles to the floor while he is in the courtroom is justified by these same essential interests and circumstances. Only such a measure will ensure that Honken cannot reach any other trial participants (with the exception of defense counsel) and will also ensure that he "will not be going anywhere" during any courtroom disruption or diversion, as Marshal Arechiga testified. *See Mayes*, 158 F.3d at 1226 ("[T]he court [i]s ... entitled to rely in part upon the expertise and experience of the Marshals Service in making its decision.").

Turning to the "prejudice" portion of the inquiry, the Eighth Circuit Court of Appeals has likewise concluded that the use of shackles is not absolutely barred by the Constitution. *See Hellum*, 28 F.3d at 908. Moreover, the use of shackles is not unfairly prejudicial, where they were "shown to be required by the unique threat posed by [the defendant]." *Hellum*, 28 F.3d at 909. In addition, the "inherent prejudice" of leg shackles is significantly ameliorated where they are concealed under the counsel table and the defendant is not moved in the presence of the jury. *Gilmore*, 861 F.2d at 1071. Where such measures are taken to conceal the use of shackles from the jury, it is unlikely that the jury will actually observe "anything 'so prejudicial as to pose an unacceptable threat to [the defendant's] right to a fair trial.' " *Id.* at 1072 (quoting *Holbrook*, 475 U.S. at 572, 106 S.Ct. 1340); *compare United States v. Van Chase*, 137 F.3d 579, 583 (8th Cir. 1998) ("The mere fact that a juror had a brief view of a defendant in custody is not sufficient to establish there was sufficient prejudice to warrant a new trial."); *United States v. Ford*, 19 F.3d 1271, 1272 (8th Cir.1994) (same), *cert. denied*, 513 U.S. 1085, 115 S.Ct. 741, 130 L.Ed.2d 643 (1995); *Joseph*, 333 F.3d at 591 (use of shackles at trial was not prejudicial, where "the shackles were kept out of view of the jury"); *Moon v. Head*, 285 F.3d 1301, 1317

(11th Cir.2002) ("We hold ... that if the jury cannot see the defendant's shackles, there can be no prejudice."), *cert. denied,* 537 U.S. 1124, 123 S.Ct. 863, 154 L.Ed.2d 807 (2003); *but see United States v. Durham,* 287 F.3d 1297, 1304 (11th Cir.2002) (the use of shackles may still burden the defendant's right to a fair trial, even if they are not visible to the jury, because they " 'may confuse the defendant, impair his ability to confer with counsel, and significantly affect the trial strategy he, chooses to follow' ") (quoting *Zygadlo v. Wainwright,* 720 F.2d 1221, 1223 (11th Cir. 1983), *cert. denied,* 466 U.S. 941, 104 S.Ct. 1921, 80 L.Ed.2d 468 (1984)).

Here, in order to limit or attempt to eliminate any prejudice that might arise from the jurors seeing that Honken is shackled and bolted to the floor while in the courtroom, the court will direct (1) that Honken not be moved in the presence of the jury; (2) that table skirts be placed on all counsel tables to prevent the jurors from seeing the shackles and bolt; and (3) that the Marshal determine the best available means to prevent the shackles from making any noticeable noise during ordinary movements of the defendant while seated. Similarly, in order to avoid any potential prejudice from Honken's inability to stand naturally at appropriate times, *see* Testimony of Marshal Arechiga, and to facilitate his ability to confer with counsel, *see Durham,* 287 F.3d at 1304, the shackles and bolt shall be fitted with sufficient chain to permit Honken to stand naturally when required and to confer with defense counsel at all times.

With these requirements, the court finds that the governmental interests in security of the courtroom and prevention of an escape attempt substantially justify placing Honken in leg shackles bolted to the floor while he is in the courtroom and that the potential for prejudice from these measures is substantially outweighed by these interests. The court will nevertheless consider whether different or additional restraints are also appropriate.

#### d. Stun belt

■ Honken has expressed a preference for a stun belt in lieu of shackles bolted to the floor. The government requests use of a stun belt at all times, in conjunction with shackling Honken to a bolt in the floor while in court and handcuffs while he is being moved. Although the court has found no case in which the Eighth Circuit Court of Appeals has conducted a "need" and "prejudice" analysis of the use of a stun belt, other Circuit Courts of Appeals have done so.

For example, in *Gonzalez v. Pliler,* 341 F.3d 897 (9th Cir.2003), the Ninth Circuit Court of Appeals concluded that "the use of stun belts raises a number of constitutional concerns"; indeed, "depending somewhat on their method of deployment, . . . all of the traditional concerns about the imposition of physical restraints." *Gonzalez,* 341 F.3d at 899–900. The Ninth Circuit Court of Appeals has recognized, further, that "[t]he use of stun belts [also] risks 'disrupt[ing] a different set of a defendant's constitutionally guaranteed rights.' " *Id.* at 900 (quoting *United States v. Durham,* 287 F.3d 1297, 1305 (11th Cir. 2002)). The court explained,

> Given "the nature of the device and its effect upon the wearer when activated, requiring an unwilling defendant to wear a stun belt during trial may have significant psychological consequences." *[People v.] Mar,* 28 Cal.4th 1201, 124 Cal. Rptr.2d 161, 52 P.3d [95,] 97 [ (2002) ]. These "psychological consequences," *id.,* cannot be understated. Stun belts, for example, may "pose[ ] a far more substantial risk of interfering with a defendant's Sixth Amendment right to confer with counsel than do leg shackles."

*Durham*, 287 F.3d at 1305. We have long noted that "one of the defendant's primary advantages of being present at the trial[ ][is] his ability to communicate with his counsel." *Spain [v. Rushen]*, 883 F.2d [712,] 720 [(9th Cir.1989)]; *see also Kennedy v. Cardwell*, 487 F.2d 101, 106 (6th Cir.1973) (asserting that restraints confuse mental faculties and thus abridge a defendant's constitutional rights). Stun belts may directly derogate this "primary advantage[ ]," *Spain*, 883 F.2d at 720, impacting a defendant's right to be present at trial and to participate in his or her defense. As the Eleventh Circuit recently observed, "[w]earing a stun belt is a considerable impediment to a defendant's ability to follow the proceedings and take an active interest in the presentation of his case." *Durham*, 287 F.3d at 1306. "The fear of receiving a painful and humiliating shock for any gesture that could be perceived as threatening likely" hinders a defendant's participation in defense of the case, "chill[ing] [that] defendant's inclination to make any movements during trial—including those movements necessary for effective communication with counsel." *Id.* at 1305.

For like reasons, a stun belt may "materially impair and prejudicially affect" a defendant's "privilege of becoming a competent witness and testifying in his own behalf." *Mar*, 124 Cal. Rptr.2d 161, 52 P.3d at 104. In the course of litigation, it is "not unusual for a defendant, or any witness, to be nervous while testifying." *Id.* at 110. "[I]n view of the nature of a stun belt and the debilitating and humiliating consequences that such a belt can inflict," however, "it is reasonable to believe that many if not most persons would experience an increase in anxiety if compelled to wear such a belt while testifying at trial." *Id.* This "increase in anxiety" may impact a defendant's demeanor on the stand; this demeanor, in turn, impacts a jury's perception of the defendant, thus risking material impairment of and prejudicial affect on the defendant's "privilege of becoming a competent witness and testifying in his own behalf." *Id.* at 104 (quoting *People v. Harrington*, 42 Cal. 165, 168 (1871)).

For these reasons, "a decision to use a stun belt must be subjected to at least the same close judicial scrutiny required for the imposition of other physical restraints." *Durham*, 287 F.3d at 1306 (citations and internal quotation marks omitted). And for these reasons, before a court may order the use of physical restraints on a defendant at trial, "the court must be persuaded by compelling circumstances that some measure [is] needed to maintain the security of the courtroom," and, as noted, "the court must pursue less restrictive alternatives before imposing physical restraints." *Morgan v. Bunnell*, 24 F.3d 49, 51 (9th Cir.1994) (citations and internal quotation marks omitted).

*Gonzalez*, 341 F.3d at 900–01 (footnote omitted) (ultimately rejecting use of the stun belt in that case, because the court had failed to make the necessary findings on its own).

Nevertheless, courts have approved use of a stun belt on a defendant during trial after the same sort of "need" and "prejudice" analysis applied above to shackles. *See Joseph*, 333 F.3d at 590–91 ("need" was shown by the defendant's combative behavior and his possession of two homemade knives on his person on the third morning of trial, and there was no prejudice where the jury was unaware of the presence of the stun belt). The Eleventh Circuit Court of Appeals has recognized that the potential for prejudice from the jurors seeing the defendant's restraints is actually "less of a concern than it generally

is with other physical restraints," because the stun belt is worn under the defendant's clothing. *Durham*, 287 F.3d at 1305. On the other hand, if the stun belt *is* seen, "the belt 'may be even more prejudicial than handcuffs or leg irons because it implies that unique force is necessary to control the defendant.'" *Id.* (quoting *State v. Flieger*, 91 Wash.App. 236, 955 P.2d 872, 874 (1998)). Nevertheless, "it is notable that a stun belt likely poses fewer problems in this regard than do other, more obvious methods of restraint." *Id.* Discharge of a stun belt presents the possibility of very serious potential prejudice, because "the discharge of a stun belt ... could cause the defendant to lose control of his limbs, collapse to the floor, and defecate on himself." *Id.* at 1306. Therefore, the Eleventh Circuit Court of Appeals concluded that use of a stun belt must be subjected to "close judicial scrutiny." *Id.*

This court agrees that use of a stun belt should be subjected to "close judicial scrutiny," because of its potentially disruptive effect on the defendant's rights and the " 'fairness of the factfinding process.'" *Stewart*, 20 F.3d at 915 (defining "inherently prejudicial" restraints, quoting *Holbrook*, 475 U.S. at 568, 106 S.Ct. 1340); *accord Durham*, 287 F.3d at 1305 (finding that use of a stun belt is subject to "close judicial scrutiny"). Nevertheless, the court finds that use of a stun belt is justified by the same essential governmental interests that justify use of shackles.

Moreover, notwithstanding the list of prejudicial aspects of the stun belt detailed by the Ninth Circuit Court of Appeals in *Gonzalez*, 341 F.3d at 900–01, the court finds that such potential prejudice is outweighed by the interests in safety of the courtroom and trial participants and prevention of any escape. Specifically, Honken cannot legitimately complain that a stun belt would be more disruptive to his rights than shackles, when he has expressed a preference for a stun belt instead of shackles. Also, this court is not persuaded that a stun belt necessarily involves all the deleterious consequences to the defendant's rights detailed in *Gonzalez*. Rather, the court finds, first, that use of a stun belt is likely to be less prejudicial, because it is entirely obscured from the jurors by the defendant's clothing, and because it provides a fair opportunity to confer with counsel. *See Durham*, 287 F.3d at 1305. Although the court agrees with the court in *Durham* that jurors actually *seeing* the stun belt " 'may be even more prejudicial than handcuffs or leg irons because it implies that unique force is necessary to control the defendant,'" *id.* (quoting *Flieger*, 955 P.2d at 874), it is likewise easier to prevent the jurors from seeing the stun belt on the defendant, on a normal basis. Again, the chances of the jurors seeing the stun belt can be limited to the extent reasonably possible by not moving the defendant in the jurors' presence. On the whole then, this court is persuaded that a stun belt "likely poses fewer problems in this regard than do other, more obvious methods of restraint." *Id.* Furthermore, the stun belt will likely avoid or limit the prejudicial effect of use of physical force by deputies to restrain Honken in an altercation, which might still be necessary if Honken were restrained by shackles, and the belt provides the further possibility that a mild warning shock will deter a situation in which a full shock or physical force might otherwise be required.

Therefore, the court finds that the governmental interest in security of the courtroom and prevention of an escape attempt substantially justify placing Honken in a stun belt while he is in the courtroom and that the potential for prejudice from this security measure can be limited and, in any event, is substantially outweighed by the governmental interests. The court also finds that Honken can and should be

moved to and from the courtroom in a stun belt and handcuffs. The addition of handcuffs at such times is justified by the interest in a safe and secure courtroom and prevention of an escape attempt, in the event of a failure of the stun belt.

### e. Stun belt and shackles

██ In its oral amendment to its motion, the government requested that Honken be placed in *both* shackles bolted to the floor and a stun belt while in the courtroom. In *United States v. Joseph*, 333 F.3d 587 (5th Cir.2003), *cert. denied*, 540 U.S. 973, 124 S.Ct. 446, 157 L.Ed.2d 322 (2003), the Fifth Circuit Court of Appeals affirmed use of *both* shackles and a stun belt on a defendant during his trial. *See Joseph*, 333 F.3d at 590–91. The court found that use of both restraints was justified by the defendant's physically and verbally combative behavior on the way to and during trial and his possession of two "shanks, or homemade knives" found on his person on the third morning of trial. *Id.* at 591. The court also found that "there was no evidence that the jury was prejudiced by the presence of these restraints, as the stun belt was not activated during the trial, and both the belt and the shackles were kept out of view of the jury." *Id.*

Here, the court finds that a stun belt and shackles are not mutually exclusive and that use of both is justified by the interests and record in this case. First, the use of shackles and bolting the defendant to the floor while in the courtroom provides a reliable "back-up" in the unlikely event of a failure of the "higher tech" restraint of a stun belt, thus providing an appropriate level of courtroom security in light of the defendant's record of violence and attempts to escape. Use of both restraints was the ultimate preference of the Marshal, once he was freed of the constraints placed on him by his legal counsel to choose only one or the other, and that

preference, the court finds upon independent review, is justified by the record in this case. *See Mayes*, 158 F.3d at 1226 (the court may not "blindly" follow the recommendations of law enforcement officers, but "[i]s ... entitled to rely in part upon the expertise and experience of the Marshals Service in making its decision," so long as the court "independently review[s] the facts and circumstances thought to warrant such a security measure and carefully consider[s] the legal ramifications of that decision"). Second, bolting the defendant's shackles to the floor will make situations in which use of the stun belt, with the negative effects described, for example, in *Durham*, that much less likely. *See Durham*, 287 F.3d at 1306 (the *discharge* of a stun belt presents the possibility of serious potential prejudice, because "the discharge of a stun belt ... could cause the defendant to lose control of his limbs, collapse to the floor, and defecate on himself."). Thus, use of both means provides an appropriate level of mutually reinforcing deterrence and protection that is justified by the essential governmental interests in safety of the courtroom and prevention of escape and does so without additional prejudice.

The court finds that the record would also justify shackling Honken, even if he is also wearing a stun belt and handcuffs, while he is being moved to or from the courtroom. Nevertheless, the court will leave to the discretion of the Marshal whether to use that level of security or whether a lesser level, for example, involving only the stun belt and handcuffs, will suffice. The court does not believe that it is improperly deferring to the Marshal's opinion by setting the *maximum* level of security, based on an independent review of the record, but leaving to the Marshal's discretion the determination of circumstances in which some lesser level of security may be appropriate. *Cf. Mayes*, 158

F.3d at 1226 (the court may not "blindly" follow the recommendations of law enforcement officers, but "[i]s . . . entitled to rely in part upon the expertise and experience of the Marshals Service in making its decision," so long as the court "independently review[s] the facts and circumstances thought to warrant such a security measure and carefully consider[s] the legal ramifications of that decision"). The court notes, however, that eliminating the shackles while Honken is being moved will limit the potential for prejudice that might arise from jurors or members of the public inadvertently seeing Honken while he is in such restraints.

On the other hand, as commonplace as the sight of handcuffs on arrestees and criminal defendants has become, the sight of handcuffs on a capital murder defendant while outside of the courtroom is likely to be viewed as simply routine. Although the court will instruct the Marshal to take great precautions to prevent jurors or members of the public from seeing Honken in handcuffs while he is being moved, Honken is not like a defendant out on bond. Rather, he is already serving a lengthy sentence on prior drug-trafficking convictions, which the jury will inevitably learn in the course of trial. *See Zeitvogel*, 84 F.3d at 283 (the trial court's decision to require restraints did not prejudice the defendant, because even without seeing the shackles, the jurors would have learned from the trial evidence that the defendant was an inmate). Furthermore, all of the witnesses in custody will appear in court in handcuffs. Therefore, Honken's appearance in handcuffs, even if inadvertently observed by jurors or members of the public, is unlikely to generate any prejudice.

### III. CONCLUSION

Upon the foregoing, the government's June 2, 2004, Motion To Have Defendant Wear Shackles At Trial (docket no. 268), as orally amended at the hearing on July 15, 2004, is **granted as follows:**

1. **While in the courtroom,** defendant Dustin Honken shall be placed in a stun belt and shackles bolted to the floor. It is further ordered that

 a. Honken shall not be moved in the presence of the jury;

 b. table skirts shall be placed on all counsel tables to prevent the jurors from seeing the shackles and bolt;

 c. the Marshal shall determine the best available means to prevent the shackles from making any noticeable noise during ordinary movements of the defendant while seated; and

 d. the shackles and bolt shall be fitted with sufficient chain to permit Honken to stand naturally when required and to confer with defense counsel at all times.

2. **While being moved to and from the courtroom,** defendant Dustin Honken, may be placed in shackles, handcuffs, and a stun belt, but the Marshal may determine, in his discretion, that a lesser level of security, for example, involving only the stun belt and handcuffs, will suffice at such times.

3. **The Marshal shall clear jurors and members of the public**

 a. from the third floor, elevators, and stairwells of the courthouse before Honken is moved to or from the courtroom; and

 b. from the courtroom before Honken is moved within the courtroom, for example, to a conference room or to the witness box, should he testify in this matter.

4. **The Marshal and the parties** shall bring to the court's attention any circumstances that develop during trial that

cause particular concerns for security or prejudice to the defendant.

**IT IS SO ORDERED.**